[Nos. B008649, B008658. Second Dist., Div. Four. May 17, 1985.]

DARRYL CHARLES WILLIAMS et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Richard C. Chier, Ellison & Ellison and Sherman M. Ellison for Petitioners.

No appearance for Respondent.

Ira Reiner, District Attorney, Harry B. Sondheim and Arnold T. Guminski, Deputy District Attorneys, for Real Party in Interest.

OPINION

**WOODS, P. J.**—By petitions for writs of prohibition pursuant to Penal Code section 999a, two defendants charged with possession of cocaine for purpose of sale seek review of respondent's order that denied their motions to set aside the information against them on the basis that they were committed without probable cause.

Petitioners' primary contention is that the arresting officer did not have cause to detain and interview them concerning prior reported felonies beyond the time reasonably necessary to write a citation for their minor traffic violation.

We agree with petitioners that the facts known to the arresting officer did not support an objectively reasonable suspicion of petitioners' involvement in recent local robberies. Accordingly, there was no justification for prolonging the detention or for the eventual request for consent to search petitioners' vehicle. Because the cocaine and firearms seized in the search are the sole evidence of the charged felonies, there was insufficient evidence to commit petitioners. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 598, fn. 4 [174 Cal.Rptr. 867, 629 P.2d 961].)

Because of this holding, we need not and do not reach the additional claims of error asserted by petitioners.[1]

The facts upon which the detention and search must be judged were adduced at the preliminary hearing and are not in substantial dispute. To the extent testimony as to certain facts is inconsistent, the facts are recited here in the light most favorable to the challenged rulings.

About 4:15 p.m. on October 11, 1982, Officer James Lowery of the Glendale Police Department was on routine patrol in a marked police vehicle. A police chaplain was in the vehicle as a ride-along. As the patrol car was proceeding eastbound on Mountain in the vicinity of Louise, "a middle-upper class residential area" in the opinion of Officer Lowery, Lowery observed a newer model, large, white Monte Carlo sedan proceeding southbound on Louise. The vehicle stopped at the intersection of Louise and Mountain, turned right and proceeded westbound on Mountain. As the vehicle passed the patrol car going in the opposite direction on Mountain, Officer Lowery observed the driver, defendant Williams, turn his head over

---

[1]The two principal contentions of petitioners not addressed here are (1) that the consent to the vehicle search was an involuntary submission to authority and (2) that the People failed to validate the chain of custody of the seized cocaine.

his left shoulder and stare at the patrol car for five seconds. Then the passenger turned his head over his left shoulder and stared at the patrol car for another five seconds. Officer Lowery observed this behavior by looking over his left shoulder and then in his side-view mirror.

Believing the occupants behavior to be suspicious, and believing that their ages and general physical appearance and that of their vehicle matched recent broadcasts of local robberies he had heard over the police radio, Officer Lowery made a U-turn and followed the defendants to see what they were up to.

The principal radio dispatch raising Officer Lowery's suspicion was one he had heard while on duty the previous night. He recalled that two black males had committed an armed residential robbery in that area and that the two robbers were described as: mid-twenties; medium-to-above in height and weight; one man fully bearded. He recalled that they used a chrome plated automatic pistol and "a yellow, newer, larger sedan." Officer Lowery was not dissuaded by the fact that defendant's sedan was white because the prior robbery occurred at night and he believed witnesses could easily mistake two light colors at night. Neither did the fact that neither defendant had a beard negate the possibility of a match in the officer's mind. Officer Lowery never saw the actual crime report prior to arresting defendants.

A second radio dispatch known to Officer Lowery concerned a robbery of an auto parts store one week before. He recalled a description of two black males in their twenties who used a chrome plated pistol. He had seen the face sheet of that report prior to October 11, but could not recall any further details. He did not recall any vehicle description.

Officer Lowery also had in mind a third broadcast received only 40 minutes before he encountered defendants. However, while it apparently involved two black males, he did not testify to any further details of that dispatch. This broadcast appears to have no real significance here.

By the time defendants' sedan reached the intersection of Mountain and Brand the police vehicle was close behind. The officer observed the sedan roll through the intersection at three to seven miles per hour without stopping for the stop sign. He immediately activated the patrol car's red and blue lights to effect a stop for the traffic violation (Veh. Code, § 22450) and to conduct a field interview to determine involvement in the recent reported robberies. As he followed the sedan closely for some distance he ran a routine vehicle registration check which revealed a Woodland Hills registration address. He also called for "shake" backup; meaning that nearby units should respond on an urgency basis with possible danger existing.

Officer Lowery began honking his horn to get the defendants' attention, and the sedan stopped almost immediately at the curb in front of 1303 North Central. Upon stopping the sedan, Williams and Holmes spontaneously raised their hands above their heads and remained seated in the vehicle. Officer Lowery believed that defendants' raising of their hands was a suspicious move. (It was stipulated at the preliminary hearing that this was a common procedure for young blacks who want to allay police concern for violence when stopped by police in the Los Angeles area.) Officer Lowery parked his vehicle behind the sedan and about three feet out from the curb to create shelter from possible gunfire.

Prior to the time of the stop, Officer Lowery did not believe that he had probable cause to detain or arrest defendants concerning an armed robbery. He wanted to find out who they were and prepare a "field interview card" relating to the recent crimes.

Before backup arrived, Officer Lowery got out of his vehicle with his gun remaining in his unlatched holster. He was concerned with the possibility of danger. He instructed the ride-along chaplain to radio for help if anything happened. He did not take his citation book out of his vehicle but did take "field interview cards" in his shirt pocket.

Officer Lowery approached the sedan on the drivers' side and asked Williams for his driver's license. Williams complied in a normal manner, producing a valid license bearing his name. Upon seeing a Los Angeles residence address on 60th Street stated on the license, the officer asked Williams "What are you doing in this part of Glendale?" Officer Lowery believed the presence of blacks in the area to be infrequent. Williams replied that he had recently moved to 1420 North Louise in Glendale. (That address is about four blocks from the stop site and is the block where the officer first saw Williams' sedan minutes earlier.) Lowery asked if Williams had any documents in his present possession that could confirm his residence. Williams answered that he did not. By this time the defendants were told that they could put their hands down if they kept them in plain view. Officer Lowery asked Williams for his vehicle registration. Without attempting to search the glove compartment for the document, Williams stated that the car was his and had been purchased for him by his brother two years before. This statement was verified by the response to computer check the officer had run on the registration, and he did not again question Williams' ownership. The officer saw nothing inside the sedan linking defendants to the prior robberies.

After Officer Hayashida arrived as the first backup, Officer Lowery asked Williams to step out of the sedan, and Williams did so in a normal manner.

The officer did not advise Williams that he was being questioned to reconcile the discrepancy between the two residence addresses with regard to writing a traffic citation (the officer's policy was to write on the citation both the address stated on the license and any different address stated by the driver) and to determine participation in the reported robberies. The men walked slowly to the rear of the sedan and conversed for what Officer Lowery recalls to have been less than two minutes. Officer Lowery learned nothing new from Williams that could link him to the robberies. He might at this point have told Williams that the purpose of the stop was the traffic violation. This might have been in response to Williams' accusation that he had been stopped because he is black. Officer Lowery asked Williams to sit on the curb to the rear of the sedan. Williams did so and was watched by Officer Lopez who had arrived as a second backup.

Officer Lowery next approached Holmes. Holmes accompanied Officer Lowery on a short stroll near the rear of the sedan. In a two-minute conversation, isolated from Williams, Holmes confirmed to the officer that Williams was his stepbrother and presently resided at 1420 North Louise. Holmes stated that he still resided with their mother at the 60th Street address in Los Angeles.

After an unproductive pat-down search, Officer Lowery had defendants sit on the curb between the rear of the sedan and the front of his patrol vehicle. He asked Williams if he could search the sedan. Williams replied "Sure. . . . Go ahead." Officer Lowery estimated that only five minutes had elapsed from the time of the stop to the request for consent to search. Officer Hayashida estimated that 10 minutes had passed since he arrived as backup.

During the entire period of the detention, Officer Lowery would not have allowed defendants to leave had they asked to. He never commenced writing a traffic citation and never removed his citation book from his vehicle. The record is silent as to whether Williams' license was returned to him.

While the backup officers watched the sitting defendants, Officer Lowery approached the driver's side of the sedan and leaned in. He lifted a handrest on the front seat and discovered a nickel or chrome-plated small caliber automatic pistol. He immediately instructed the other officers to handcuff defendants and resumed his search. He saw a "department store box" on the back seat. At that point Officer Lowery was searching for evidence of the robberies. He opened the box and discovered two large manila envelopes containing a white powdery substance that was later confirmed by expert chemical analysis to be 440 grams of cocaine. Defendants were then arrested and placed in separate police vehicles for transportation to the Glen-

dale police station. Another pistol was retrieved from the sedan. After depositing defendant Williams and the seized evidence at the station for booking, Officer Lowery checked the rear seat of his vehicle and discovered a vial of cocaine that had not been there when he inspected it before he went on duty that day.

The three prior crime reports that were the bases for the police radio reports that caused Officer Lowery to suspect defendants were introduced into evidence at the preliminary hearing as defense exhibits A, B, and C. The report of the "Palmer Street robbery," exhibit C, described the first of the two black male robbers as being 6 feet 3 inches tall, weighing about 249 pounds, having black hair and brown eyes, and being 25 years old. The report describes the second robber as 5 feet 9 inches tall, about 150 pounds, having black hair, brown eyes, and a full beard, and as being 45 years old. The vehicle used by these robbers was described as being yellow.

The police report concerning the auto parts store robbery describes one of the two black male robbers as being 6 feet 1 inch tall, weighing 170 pounds, 25 years old, and having brown eyes and hair. The second robber was 5 feet 10 inches, 160 pounds, and between 25 and 27 years old. There is no vehicle description.

At the preliminary hearing, the magistrate commented with regard to Holmes that the police dispatch description of the smaller of the "Palmer" robbers as to the height and age only [five feet nine inches and forty-five years old]—disregarding the weight and facial hair discrepancies—"would be close enough . . . to give a description of Mr. Holmes; at least place him in the category of that description."

Discussion

Under these circumstances, the investigative detention up to the time the officer asked for consent to search must be justified on one of two bases: (1) that the detention period was reasonably necessary for completion of the officer's duties relative to the traffic violation; or (2) that after the stop the officer had sufficient cause to conduct an investigative detention of defendants on the independent suspicion that they were the armed robbers described in the police broadcasts. The burden of proof was upon the People. As explained herein, this burden has not been met.

I

The leading case concerning unlawful prolongation of traffic stop detentions is *People* v. *McGaughran* (1979) 25 Cal.3d 577 [159 Cal.Rptr. 191,

601 P.2d 207]. There a patrolling officer stopped a vehicle for a traffic violation for which the driver could not be taken into custody. After concluding his duties relative to completion of the citation and obtaining written promise to appear from the driver, the officer further detained the driver and conducted a computer warrant check. The officer suspected possible drug trafficking due to the driver's and passenger's out-of-county residences and a furtive move by the passenger when the officer had activated his red flashing light. After ten minutes, the check revealed a burglary warrant on the driver and two traffic warrants on the passenger. Arrests were effected and an item stolen from a recent local burglary was seized. It was held that the prolongation of the traffic detention beyond the point when the duties "reasonably necessary" to completion of the citation had been performed was unlawful and the seized evidence was suppressed as a product thereof.

■ *McGaughran* enumerated the specific duties "reasonably necessary" to complete a traffic infraction detention. The period of lawful detention is limited to the time reasonably necessary for the officer to prepare the notice to appear (i.e., a citation or "ticket"). This entails investigating the driver's license and vehicle registration, explaining the reason for the citation, and detailing the particulars of the violation on the citation. The offender must be released when he signs the written promise to appear. Additional duties may exist in listening to any explanation the driver might offer, examining the vehicle for unsafe conditions or moving the vehicle if it is stopped in an unsafe location. The time it takes the officer to return to the patrol vehicle to request a timely warrant or registration check may also be included as part of the necessary period of detention. (*Id.*, at pp. 583-584.)

■ The holding of *McGaughran* does not mean that the officer may detain and interrogate the traffic offender as to possible unrelated offenses for the time it would otherwise take to fully perform his citation duties. Thus, contrary to the People's contention, the *McGaughran* rule does not validate Officer Lowery's search merely because he commenced the search within the 10-minute period it took the officer in *McGaughran* to complete his citation duties. The import of *McGaughran* is not the setting of a general outside time limit for minor traffic offense detentions. Implicit in the *McGaughran* analysis is a recognition that the circumstances of each traffic detention are unique and that the reasonableness of each detention period must be judged on its particular circumstances. ■ The clear intent of *McGaughran* is to preclude officers from imposing a general crime investigation upon the detained traffic offender that is not "reasonably necessary" to completion of the officer's traffic citation duties unless the officer has an independent reasonable suspicion that the driver has committed unrelated offenses.

In our case, Officer Lowery promptly obtained all the information he needed to perform his citation duties but he elected not to complete the citation form in the normal course of events. Thus the officer's prolongation of the detention differs in detail but not in kind from the prolongation of the detention in *McGaughran;* the result—unnecessary extension of the traffic detention to investigate extraneous matters—is identical.

By Officer Lowery's own description of his standard citation procedures, his further inquiry as to Williams' true residence was not "reasonably necessary" to completion of a citation. (See *People* v. *McGaughran, supra,* 25 Cal.3d at p. 587.) Before Williams alighted from his vehicle the officer had seen the residence address stated on Williams' license and had heard Williams claim that 1420 North Louise address was his new address. Any doubt as to Williams' ownership of the vehicle was resolved in the officer's mind before Williams exited his vehicle. The prolonged interrogation of defendants was thus directed solely toward determining their complicity in the armed robberies. For these reasons, the prolongation of the detention here may not be justified as "reasonably necessary" to the officer's performance of his duties relative to the traffic violation.

## II

The next inquiry is whether the officer had a rational suspicion that defendants were the robbers described in the recent radio dispatches.

The parties correctly agree that the standard for determination of this question is stated in *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]: "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so; the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question." (Fn. omitted.)

This determination is one of law for an appellate court, based upon the express and implicit findings of fact supporting the lower court's ruling. This court is thus required to make its own independent determination whether the officer's suspicion was constitutionally reasonable when the circumstances of this case are viewed most favorably in support of the challenged ruling. (*People* v. *Leyba, supra,* 29 Cal.3d at pp. 597-598.)

 Comparison of the descriptions in the robbery detailed reports with the officer's recollection of the police broadcasts demonstrates that no such rational justification existed.

The officer believed that defendants might be the robbers because they were two black males, appeared to be in their mid-twenties, were driving in a larger, newer, white sedan and had stared at the patrol vehicle in an unusual manner and had raised their hands for no apparent reason. However, the officer's *total* recollection of the auto parts store robbery of the week prior was that two black males in their mid-twenties were responsible. He did not recall the height and weight descriptions. No vehicle description was broadcast. These recalled facts do not supply sufficient particularity to support an objectively reasonable suspicion, one week later, of defendants' guilt.

The officers' recollection of the "Palmer" robbery was materially distorted. He selectively took off 20 years and a full beard from the description of one robber and reduced the 6-foot-3-inch, 249-pound robber to "average-to-above-in-height-and-weight" to meet the general physical appearance of defendants. Neither Williams nor Holmes was nearly so large and neither had any beard. The magistrate believed that Holmes looked more like 45 than 25 years old.

The officer's distorted recollection of the Palmer robbery dispatch (apparently transposing aspects of the auto parts store dispatch) may not serve as a valid basis for suspecting persons who coincidentally meet the conglomerate description. If such subjective editing of dispatch reports by the officer were allowed to justify the investigative detention of two black males who in fact bear no reasonable resemblance to the actual separate descriptions broadcast, then police could by their own creativity manufacture cause to conduct an investigative detention upon an unconstitutionally broad range of persons who commit a traffic infraction in the area of recent serious crimes.

The People seek to ameliorate the fact that the officer apparently confused the dispatches of two robberies to create a composite description matching defendants by pointing out that at the preliminary hearing the magistrate commented that ". . . the description of the bearded ['Palmer' robber] was approximately five feet nine, 45 years old . . . which I think would be close enough, at least with respect to height and age, to give a description of Mr. Holmes; at least place him in the category of that description. Certainly he does not have a beard."

This argument does not avoid the problem that Officer Lowery testified consistently, even when confronted with the contents of the written "Palmer

robbery" detailed report, that he recalled both those robbers to be in their mid-20's and average-to-above in height and weight. The magistrate's subsequent finding that one defendant might very generally match the actual dispatch description of one of the robbers—ignoring the incongruent fact that Holmes did not appear to weigh 150 pounds—does not validate the erroneous factual basis of the arresting officer's subjective suspicion.

■ Implicit in the *In re Tony C.* rule is the requirement that the detaining officer's subjective suspicion must be based upon a reasonably accurate recollection of the official description of the wanted felons. While officers should not be held to absolute accuracy of detail in remembering the numerous crime dispatches broadcast over police radio, Fourth Amendment guarantees require demonstration of the reasonableness under the circumstances of "the particular governmental invasion of a citizen's personal security." Police may not arbitrarily bother citizens enjoying the use of public streets. (*Id.*, at pp. 892-893.) An investigative detention premised upon an officer's materially distorted recollection of the true suspect description is as arbitrary and unreasonable an intrusion upon citizens' rights as one premised upon too vague a description or one where the detainee bears no reasonable resemblance to the officer's accurate recollection of the true description. In none of these circumstances is the purpose of *In re Tony C.* standard met.

■ Even assuming that Officer Lowery entertained an earnest belief that defendants reasonably matched the crime report of the robbers, that belief was incorrect and was not objectively reasonable under the circumstances.

■ Finally, the People contend that the furtive conduct of defendants when they first stared at Officer Lowery's patrol vehicle and when they stopped their vehicle and raised their hands either strengthens or independently supports the officer's suspicion. A similar contention was squarely rejected in *People* v. *McGaughran, supra,* 25 Cal.3d 577. There the People urged justification for the detention on the basis of the known high frequency of illegal narcotics trafficking in the area and the "furtive gesture" of the passenger of the vehicle who appeared to turn around and place something in the back seat. *McGaughran, supra,* 25 Cal.3d 577, held that such a gesture "can be deemed suspicious only when there are additional facts known to the officer that reasonably give it a guilty connotation," such as prior reliable information or the officer's personal observation of contraband. (*Id.*, at p. 590.) The *McGaughran* court referred to its earlier decision in *People* v. *Superior Court (Keifer)* (1970) 3 Cal.3d 807, 824-827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559], where it criticized earlier Court of Appeal decisions that gave unwarranted significance to innocuous

gestures. Neither of defendants' perceived "furtive gestures" satisfy the *McGaughran* standard.

We conclude that there was no objectively reasonable suspicion justifying prolongation of the detention to the time of the search.

Let a peremptory writ of prohibition issue directing respondent to vacate its order of November 16, 1984, in Los Angeles Superior Court case No. A 589539, entitled the People v. Darryl Charles Williams and Melvin James Holmes, which denied petitioners' motions pursuant to Penal Code section 995, and to make a new and different order granting those motions. This court's stay order of December 17, 1984, shall remain in effect until this opinion becomes final as to this court.

McClosky, J., and Arguelles, J., concurred.

A petition for a rehearing was denied June 5, 1985.