Eugene P. AUREGUY and Craig M. Aureguy, Plaintiffs,

v.

TOWN OF TIBURON, Tiburon Police Department, et al., Defendants.

No. C 91–0214 BAC.

United States District Court, N.D. California.

June 29, 1993.

Robert R. Moore, Moore, Divelbiss & Gulick, San Francisco, CA, for plaintiffs.

Eugene B. Elliot, Bertrand, Fox, Elliot & Cohn, San Francisco, CA, for defendants.

## MEMORANDUM AND ORDER

CAULFIELD, District Judge.

### INTRODUCTION

Plaintiffs and defendants have filed cross-motions for partial summary judgment. Plaintiffs seek a ruling that defendants are not entitled to assert a defense of qualified immunity in this matter. Defendants' cross-motion seeks a ruling that they have qualified immunity for their actions on the date in question. Upon consideration of the briefs and arguments of the parties in support of and in opposition to the motions, and good cause appearing therefrom, plaintiffs' motion for partial summary judgment is DENIED; defendants' cross-motion is GRANTED.

### FACTS AND BACKGROUND

On October 17, 1990 at approximately 11:34 p.m., Officers McVeigh and Comfort were parked in separate marked police vehicles conversing on Tiburon Boulevard. Both vehicles were facing eastbound. The officers

observed a vehicle drive by with a broken left taillight. Officer McVeigh told officer Comfort that he was going to talk to the driver about the taillight. Officer McVeigh activated his red light and pulled the vehicle over in front of 1550 Tiburon Boulevard adjacent to the Boardwalk Shopping Center.

Officer McVeigh left his police car and approached the driver's side window. Officer McVeigh explained to the driver that he stopped him regarding his rear light and requested to see his driver's license, registration and insurance. The driver quietly produced the requested information. Officer McVeigh then directed the driver to wait in his vehicle while he conducted police business in the patrol car.

When Officer McVeigh looked up from his patrol car to observe the vehicle's occupants he noticed that the vehicle's registration was expired. Officer McVeigh removed his ticket book from the car and started writing a ticket for the taillight and expired registration. Shortly thereafter, Officer Comfort arrived to assist.

Officer McVeigh placed the driver's license on a clip on his ticket book. Officer Comfort observed the license and said he recognized the name Aureguy as someone that was involved in an altercation with a Tiburon police officer in 1982.

Officer McVeigh radioed police dispatch and requested a warrant check, a 3 × 5 card check, and a driver's license check on Craig Aureguy's driver's license number. The amount of time involved in conducting these checks is in dispute. Officer McVeigh states that he requested the additional 3 × 5 card check for purposes of officer safety in light of Officer Comfort's statement regarding a prior altercation.

The police dispatcher notified Officer McVeigh that Craig Aureguy had no warrants, and provided the driver's license status and information from Craig Aureguy's 3 × 5 card regarding previous contacts with the Tiburon police speeding and altered driver's license. Thereafter, Belvedere Police Officer Christopher Poole, who was driving in a separate patrol vehicle, advised over the radio that three days earlier he dealt with a

Eugene Aureguy, who was involved in a previous assault on an officer. The police dispatcher radioed back and confirmed the information provided by Officer Poole. Officer Poole also informed McVeigh that Eugene Aureguy had been drinking and that he had given him a ride to a residence.

Officer McVeigh completed the citation and approached the driver's side of the vehicle. As McVeigh approached the vehicle, the driver's door opened and Craig began to get out, yelling loudly, questioning the delay. McVeigh instructed Aureguy to get back in the vehicle and closed the door.

Officer McVeigh began explaining to Craig Aureguy that the vehicle's registration had expired; Craig argued that it had not. After McVeigh explained that he was issuing a "fix it" ticket and that he if he signed it he could be on his way, Craig yelled, "Fuck you, my registration is not expired" and opened the door on Officer McVeigh's leg. Officer McVeigh closed the door and asked Craig to stay in the car until they were done.

Craig continued yelling that his registration had not expired. As he was yelling, Officer McVeigh detected a moderate odor of alcohol on Craig's breath. Officer McVeigh again gave Craig the ticket and the opportunity to sign it and be on his way. Craig, however, continued arguing about the registration at which point Officer McVeigh put his ticket book on the roof of the car and asked, "Would you like to come out and take a look at it?" Craig got out of his vehicle, went to the rear, and continued yelling, using profanity, stating that there was a lien on the vehicle. As Craig continued to yell, McVeigh detected a stronger odor of alcohol from Craig. McVeigh requested Craig to perform field sobriety tests because of the odor of alcohol on his breath. Shortly thereafter, a dispute arose which escalated into a physical altercation between plaintiffs and defendant officers.

## DISCUSSION

This court has previously ruled that the delay caused by the impermissible 3 × 5 card check excessively prolonged plaintiffs' traffic detention. As Judge Eugene F. Lynch held in the order dated November 4,

1991, the initial stop of the plaintiffs was legal. Plaintiffs were driving with a taillight out, a traffic violation. Defendants had a right to detain plaintiffs solely for purposes of citing them for that infraction. While Judge Lynch felt defendants properly detained plaintiffs after one of the officers smelled alcohol on Craig Aureguy's breath, this court is bound by the ruling issued by the state Superior Court under the rules of collateral estoppel. Accordingly, as the state Superior Court suppressed the field sobriety test administered to Craig Aureguy, the results of said test, and the officers' smelling of alcohol on Craig Aureguy's breath, the entire period beyond the time necessary for the routine traffic stop constitutes an illegal detention.

While both sides attempt to set forth a chronology of the events that transpired, a question of fact remains as to exactly how much time is properly allotted between the legal and illegal detention.

### A. Standard

Summary judgment is appropriate where "there are no genuine issues as to any material fact and ... the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and material facts are those "that might affect the outcome of the suit under the governing law," *id.* at 248, 106 S.Ct. at 2510. All reasonable inferences from the evidence must be drawn in favor of the non-moving party. *Id.* at 242, 106 S.Ct. at 2505.

### B. Qualified Immunity

A police officer is entitled to qualified immunity for allegedly illegal official acts insofar as his conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As the United States Supreme Court explained in *Anderson v. Creighton*, 483 U.S.

635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), in order to conclude that the right which the officer violated is "clearly established," the contours of the right must be sufficiently clear that a reasonable officer would understand that his specific conduct violates that right. *Id.* at 640, 107 S.Ct. at 3039. "[B]ecause 'the entitlement is an *immunity from suit* rather than a mere defense to liability,' *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985), we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* —— U.S. ——, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

This court is bound under principles of collateral estoppel to uphold the state Superior Court's ruling on the legality of plaintiffs' detention. However, to determine whether the officers are entitled to qualified immunity, this court must independently examine the state of the law at the time of the illegal detention and determine whether the officers could have reasonably, albeit incorrectly, believed their actions lawful.

Plaintiffs' reliance on *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir.1990), in support of their claim that the officers unreasonably violated plaintiffs' clearly established civil rights is misplaced. The present case is distinguishable from *Duran* in that here the initial detention was legal. Therefore, the inquiry is not whether the officers unreasonably believed there was reasonable suspicion or probable cause to initially detain the plaintiffs, but whether the officers could have reasonably believed they acted lawfully by prolonging the traffic detention to run the 3 × 5 card check.

On the issue of prolonged detentions, the United States Supreme Court stated in *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), that there is "no hard-and-fast time limit" for the permissible length of a detention. Whether a legal detention is excessively prolonged depends upon whether the police officers actions were reasonably related in scope to the circumstances which initially justified the detention. *Id.* at 682, 105 S.Ct. at 1573; *see*

*also, Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ Defendants argue that, under the circumstances, the officers could have reasonably believed lawful the plaintiffs' prolonged detention because, under California state law, 10 to 20 minutes to perform a traffic stop is objectively reasonable. Specifically, defendants assert that the prolonged stop was necessary in the interest of officer safety. A review of California state law demonstrates that California law is consistent with federal law and does not support a bright line time standard for traffic detentions. The court views that the prolonged detention was justified by officer safety concerns.

### a. *Permissible Time for Routine Traffic Stop*

The seminal California decision on the permissible length of routine traffic detentions is *People v. McGaughran,* 25 Cal.3d 577, 159 Cal.Rptr. 191, 601 P.2d 207 (1979), applied here by the state Superior Court to determine the illegality of the detention. In *McGaughran,* the defendant was initially stopped for driving in the wrong direction on a one-way street. The officer detained the defendant and his passenger to advise them as to why they had been stopped, to examine both of their drivers licenses, and to listen to their explanation for the violation. *Id.* at 585, 159 Cal.Rptr. 191, 601 P.2d 207. While the officer intended only to issue a warning for the traffic violation (as it was a confusing intersection), the officer returned to his patrol car and called for a warrant check instead of promptly releasing the defendant and his passenger. The court held that the additional period for the warrant check was not reasonably necessary to deal with the traffic violation and therefore constituted an illegal detention. *Id.* at 587, 159 Cal.Rptr. 191, 601 P.2d 207.

*McGaughran* explained that the permissible period of detention for a routine traffic stop is limited to the time reasonably necessary for the officer to complete his duties incurred by the traffic violation. *Id.* at 584, 159 Cal.Rptr. 191, 601 P.2d 207. Outlining the parameters of this permissible detention period, the court identified no bright line time standard, but instead focused on the nature of the officer's alleged misconduct and whether such conduct could be found reasonably necessary to deal with the traffic violation.[1] Under *McGaughran,* any delay produced by an act unnecessary to the officer's citation duties exceeds constitutional bounds and results in an illegal detention.

Applying the *McGaughran* "reasonably necessary" standard, a California Court of Appeal explicitly rejected a bright line rule for the permissible length of traffic detentions: "The import of *McGaughran* is not the setting of an outside time limit for minor traffic offense detentions. Implicit in the *McGaughran* analysis is a recognition that the circumstances of each traffic detention are unique and that the reasonableness must be judged on its particular circumstances." *Williams v. Superior Court,* 168 Cal.App.3d 349, 358, 213 Cal.Rptr. 919 (1985). *Williams* restated that a traffic detention's legality depends not upon the length of time the officer detained the traffic offender, but on the officer's acts and whether they were reasonably necessary to complete the citation process. Accordingly, *Williams* held that an officer may not lawfully detain an individual for impermissible reasons despite the fact that the illegal detention was no longer than the legal traffic detention would have been if the officer had used the time to fully perform his citation duties. *Id.* at 358, 213 Cal.Rptr. 919.

■ Contrary to defendants' assertions, neither *People v. Dasilva,* 207 Cal.App.3d 43, 254 Cal.Rptr. 563 (1989), nor *People v. Gorak,* 196 Cal.App.3d 1032, 242 Cal.Rptr. 307 (1987), support the proposition that a traffic detention's reasonableness is measured in

---

1. This permissible period of detention includes the time required by the officer to: (1) write out the citation and obtain the offender's promise to appear, (2) investigate the driver's license and vehicle registration, (3) explain in detail the reason for the citation and listen to any explanation offered, and (4) examine the vehicle for unsafe conditions or move the vehicle from an unsafe location. In addition, the court included the time required for an officer to return to the patrol car to request a timely warrant or registration check as part of the permissible detention period. *McGaughran,* 25 Cal.3d at 584, 159 Cal. Rptr. 191, 601 P.2d 207.

906

time. Both cases hold that a traffic detention may be permissibly prolonged beyond the time necessary to issue the traffic citation, if the detaining officer has probable cause or reasonable suspicion of criminal or otherwise dangerous activity. However, the focus of each decision's analysis is not the length of the detention, but the conduct of the officers and whether they diligently pursued a means of investigation likely to quickly confirm or dispel their suspicions. *Dasilva,* 207 Cal.App.3d at 50, 254 Cal.Rptr. 563; *Gorak,* 196 Cal.App.3d at 1036, 242 Cal.Rptr. 307 (both citing *Sharpe,* 470 U.S. at 686–87, 105 S.Ct. at 1575–76).

### b. *Officer Safety Concerns*

 In establishing the permissibility of an investigatory stop, *Terry v. Ohio* did recognize the safety of police officers as a legitimate and weighty concern. However, the Court denied that this weighty concern is sufficient to allow officers to interfere with citizens' freedoms unless it be for specific, legitimate, and articulative reasons. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. *Anderson v. Creighton* modified the qualified immunity inquiry to focus solely on the objective reasonableness of the misconduct. In so doing, the court in *Anderson v. Creighton* also made clear that the objective determination will "require examination of the information possessed by the [detaining] officers." 483 U.S. at 641, 107 S.Ct. at 3040.

To support their claim that the officers could have reasonably believed their conduct lawful because of objective concerns for officer safety, defendants offer the fact that two officers recognized the name Aureguy as someone who was involved in an altercation with police officers in 1982. The altercation was substantial enough to trigger recall in the two officers eight years after the incident. Under the standard set forth in *Terry* and *Anderson,* defendants' conduct was objectively reasonable, considering the information possessed by the officers.

That officers need be cautious when making routine traffic stops is well-established. In *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the United States Supreme Court cited statistics which showed that approximately 30% of police shootings occurred when a police officer approached a subject seated in an automobile. Bristow, *Police Officer Shootings—A Tactical Evaluation,* 54 J.Crim.L.C. & P.S. 93 (1963). The court went on to state that "we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. *United States v. Robinson,* 414 U.S. 218, 234, 94 S.Ct. 467 [476, 38 L.Ed.2d 427] (1973). Indeed, it appears 'that a significant percentage of murders of police officers occurs when the officers are making traffic stops.' *Id.* at 234, n. 5, 94 S.Ct. at 476 [n. 5]." *Mimms,* 434 U.S. at 110, 98 S.Ct. at 333. Where, as here, the officers in question specifically recall that someone named "Aureguy" had previously been involved in a substantial altercation with police, the prolonged stop to confirm the officers' suspicions prior to approaching the car again is objectively reasonable.

### ORDER

For the foregoing reasons, and good cause appearing,

1. Defendants' motion for partial summary judgment is GRANTED.

2. Plaintiffs' motion for partial summary judgment is DENIED.

3. Plaintiffs' motion for sanctions is DENIED.

IT IS SO ORDERED.