Filed 2/18/16  P. v. Gollihar CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C077600 |
| Plaintiff and Respondent, | (Super. Ct. No. MF036870A) |
| v. | |
| DELBERT LEON GOLLIHAR, | |
| Defendant and Appellant. | |

After receiving probation for possession of a controlled substance pursuant to a plea agreement, defendant Delbert Leon Gollihar appeals, contending the trial court erred by denying his motion to suppress evidence.  (Pen. Code, § 1538.5; unless otherwise set forth statutory references that follow are to the Penal Code.)  We affirm the judgment.

FACTS AND PROCEEDINGS

An information filed December 12, 2013, charged defendant with possession for sale of methamphetamine (count 1; Health & Saf. Code, § 11378) and carrying a

1

switchblade knife (count 2; § 21501, subd. (b)), and alleged a prior conviction for violating Health and Safety Code section 11378.

Defendant filed a motion to suppress evidence, asserting that his warrantless detention, the search of his person, and his arrest were unlawful. Defendant's "summary of anticipated evidence" alleged: Officers responded to a dispatch about an altercation between a male and a female at 19 West Whittier Avenue in Tracy. Instead, they went to 19 *East* Whittier Avenue, where they encountered defendant and another adult male, who did not fit the caller's descriptions and were doing nothing illegal.

Opposing the motion, the People asserted the officers had reasonable suspicion to detain defendant because he attempted to flee from them and because they were acting on a corroborated tip from an informant; they had reasonable suspicion to do a pat down search because he acted nervous and had a suspicious object in his pocket; they had probable cause to arrest defendant when they found an illegal switchblade on his person; and they found methamphetamine on his person through a search incident to arrest.

At the hearing on defendant's motion, Tracy Police Corporal Daniel Pasquale testified as follows:

Around 2:25 p.m. on August 25, 2013, he and his partner, in uniform, were proceeding southbound in a marked patrol car on Holly Drive around 20th or Emerson. (A map in evidence at the hearing shows that 20th Street, Whittier Avenue, and Emerson Avenue are parallel east-west streets; 20th Street is one block north of Whittier Avenue and Emerson Avenue is one block south of Whittier Avenue. Holly Drive is the dividing line between East Whittier Avenue and West Whittier Avenue.) At that time, they received a radio dispatch about an argument between a man and a woman at "19 East Whittier Avenue," near a white sedan. According to the dispatch, the woman was in the car and the man was outside yelling at her, possibly armed with a metal rod or crowbar.

Being only a block or two away, the officers reached 19 East Whittier Avenue "within a minute or two." Corporal Pasquale recalled turning right onto Whittier Avenue

2

from Holly Drive; if he had actually done so while heading southbound on Holly Drive, that would have put him onto West Whittier Avenue. The officers did not record the exact time they arrived. They had heard "probably two" radio transmissions about the call.

The officers had no further description of the subjects. Corporal Pasquale believed a description of the male subject (or of his clothing) came in later, "but we were already out of the car at the time, so I wasn't paying attention to it." They were "literally around the corner" when they heard the original dispatch; then, on reaching the site of the detention, "we got out of the car and were dealing with things."

The officers saw a white sedan parked in the driveway at 32 East Whittier Avenue and two people standing "right against it" in the driveway outside the passenger door. One had "longer" grey hair; the other also had "somewhat longer hair," though shorter than the first person's. Corporal Pasquale could not remember what the first person was wearing; the second person had on shorts and a white tank top. One person was waving his or her arms; Corporal Pasquale could not tell if the person was angry or telling a story. The other was just standing against the car. Neither was holding a crowbar or any similar object. From four or five houses away, coming off Holly Drive, the officers could not determine the persons' genders.

As Corporal Pasquale got out of his patrol car, one of the persons (later identified as defendant) started walking very fast toward the front door of the house at 32 East Whittier Avenue, while the other person (later identified as Christian Lamar) stayed put. Defendant's speed caught Corporal Pasquale's attention. Because of that conduct, and because Corporal Pasquale did not know yet whether the persons at the scene were the ones described in the dispatch, he decided to talk to defendant.

Corporal Pasquale said, "Stop, police" when defendant was five feet from the car, but defendant kept walking. Defendant also failed to respond to a second call to stop. Corporal Pasquale could see, but not identify, an object in defendant's closed left hand.

3

As defendant got near the front of the house, Corporal Pasquale intercepted him and asked what was in his left hand; defendant showed it was his wallet. Seeing a metal clip on defendant's right pants pocket, Corporal Pasquale asked if defendant had weapons on his person. Defendant responded, "I'm not searchable." When Corporal Pasquale pointed to the metal clip and asked what it was, defendant said it was a knife. Officer Daniel Woods, who had arrived separately at the scene, took the knife from defendant and opened it. Observing that it was an unlawful switchblade or gravity knife, the officers arrested defendant. On searching his person, they found a baggie suspected of containing methamphetamine.

Officer Woods testified that he heard the radio dispatch and arrived at the location of the detention as the backup to Corporal Pasquale. Patrol cars have mobile data computers which transmit information in printed form, but it is very difficult to read the transmissions line by line while driving, so officers usually just go by the radio dispatch until they have a chance to read the printout.

Officer Woods did not recall any description of the persons involved in the altercation, other than that one was male and the other female. He also did not recall what time he got to the scene.

When Officer Woods arrived, Corporal Pasquale was talking to defendant about the dispatch, while Pasquale's partner was talking to the other person who had long hair, wore shorts and a "wife beater" tank top, and "looked kind of like a female." Officer Woods believed the tank top was white, though he was not completely sure; he did not remember the color of the shorts. When Officer Woods got close to the person, he realized it was a male whom he had dealt with before. Defendant was wearing pants and a shirt, which Officer Woods remembered as "darker in color," but could not remember the exact color.

Defendant denied that he had anything to do with the reported altercation and kept trying to go into the house. Just before they began the pat down search, Corporal

4

Pasquale said he had seen the metal clip in defendant's pocket. Officer Woods knew that knives carried with such clips are sometimes modified. When he removed the object, which was attached to the clip, he determined that it was an unlawful gravity knife.

Officer Dwayne Pavelski, who was Corporal Pasquale's field trainee on the date of the crime, testified that he could not recall whether dispatch gave the address as East or West Whittier Avenue, or whether they went to East or West Whittier Avenue; he remembered only that the street number was 19. He did not receive a description of the man and woman involved in the altercation. He could not recall the clothing of the persons the officers encountered. At first sight, he thought they were females because he saw only their long hair from the back.

Tim Silva testified that as he sat in the front room of a friend's residence at 76 West Whittier Avenue, he heard a disturbance outside. He opened the door and saw a man yelling at a woman. When the man got louder and more agitated, Silva called 911. He saw two cars, one of which was white. He heard the woman ask the man for her car keys, then saw him throw them onto the sidewalk. After Silva walked back inside, he heard a bang, like the sound of someone hitting a car with a pipe or other metal object. The woman tried to start the parked white car, but it would not start, so she walked off toward Court Drive, one block west of Holly Drive. Then the man got in his car, which had been parked behind the white car, turned around, and drove off down Holly Drive.

Silva described the male as white, five feet six or five feet seven inches tall, in his late 30's or early 40's, and bald; he described the woman as white, brown-haired, and about the same height as the man. He did not remember if he described their clothing. He did not see the man with any sort of weapon.

A recording of the 911 call was played, and Silva authenticated it.

Sandra Zepeda, acting dispatch supervisor for the Tracy Police Department, testified generally as to dispatch procedures, and specifically as to Defendant's Exhibit A,

5

a printout titled "Incident Inquiry," which recorded the history of the 911 call and the police response.

When a 911 caller and the dispatcher start talking, the dispatcher pulls up a screen and starts entering the information. Once the dispatcher hits "enter," the information goes to a second dispatcher, who transmits it by radio to officers in the field; it also "eventually" shows up on their cars' mobile data computers. The call history would not show when the officers communicated back to the dispatcher.

The Incident Inquiry in this case showed that the department received the call at 2:24 p.m. The dispatcher who took the call, identified on the printout as "1162," was Jessica Rindell, who no longer worked for the department. The radio dispatcher, identified on the printout as "632," was Ed Herrera.

According to the printout, Rindell entered the location of the reported incident as 19 West Whittier Avenue. That information was received at 2:24:45 p.m., when the call came in. The information went out to the officers when Herrera dispatched it at or after 2:26:20 p.m. The address was consistently shown on the printout as 19 West Whittier Avenue.

The 911 transcript, offered in evidence as Defendant's Exhibit C, shows the following:

At 2:23:44 p.m., Rindell answered the call. Silva stated: "Ah, yeah, I want to report a, a couple, a man and a woman, fighting at 19 West Whittier." Rindell repeated the address, and Silva confirmed it. He added that the man had a "big old bar" or "metal rod" in his hand ("something like" a crowbar "but longer"), was trying to get in the woman's small white sedan, and was "kind of going berserk." He could not say whether the man was threatening the woman with the bar because it was out of his view, but the man was "up in her face and being very, very aggressive towards her."

6

Both persons looked white. The man was wearing "green or something" shorts and a T-shirt; the woman was wearing "like a black skirt . . . a little above her knees" and "some kind of shirt" of a color Silva could not name.

Silva reported that the man was hitting the woman's car with the bar or rod while she was inside the car, then trying to get into it. Rindell asked whether the people were still there.

At 2:26:03 p.m., Herrera spoke for the first time: "Tracy Incoming detail 415. 19 West Whittier. One Nine West Whittier. Male subject with a possible crowbar hitting a vehicle. A female's inside the car."

At 2:26:24 p.m., Silva told Rindell that the woman was still sitting in the car. He then said she had been unable to start her car, so she was walking west on West Whittier toward Court Drive. She was a "brunette" wearing a black shirt with a gray skirt. The man did not appear to be following her, but her car was still in front of 19 West Whittier. He left in his car.

At 2:26:25 p.m., the transcript shows "Radio Traffic" "[u]nintelligible."

At 2:26:45 p.m., Herrera stated: "Vehicle's going to be a white sedan. Male's a W [*sic*] male. He's got a T-shirt and shorts. W femme [*sic*] has a black shirt, correction black skirt. Unknown shirt."

At 2:27:29 p.m., Herrera stated: "Yes, talking to Whittier. The vehicle's [*sic*] now walking westbound on Whittier towards Court. Got a black shirt, grey skirt, brown hair."

At 2:27:45 p.m., "Radio Traffic" stated: "[Unintelligible] copy."

At 2:28:33 p.m., Rindell asked Silva what kind of car the male was in; he replied: "Um, it was a little silver 2-door car [unintelligible]." Asked which direction the male went, Silva replied that he went toward Holly Drive, but his direction from there was unknown. Asked if there was anything else he remembered about the male, Silva replied:

7

"He had real short hair; maybe even bald." He was about five feet seven inches tall. His T-shirt was olive green or olive drab green, and his shorts were green too.

At 2:29:02 p.m., Herrera stated: "The vehicle is still there. The male got into another silver, 2-door type vehicle and left towards Holly. Unknown from there."

Following further unintelligible "Radio Traffic" at 2:29:50 p.m., a speaker identified as "Radio Traffic" stated at 2:30:13 p.m.: "285-195 in the area and for your info, we haven't seen that coming southbound Holly--that vehicle."

At 2:30:37 p.m., "Radio Traffic" stated: "We're out on Whittier."

At 2:31:53 p.m., "Radio Traffic" stated: "We have 429 probation warrant" and identified the subject as Christian Lamar (the other person found with defendant).

At 2:32:49 p.m., "Dispatcher #2" stated: "1026 DL's expired."

At 2:35:28 p.m., "Radio Traffic" called in defendant's name.

Finally, at 2:36:17 p.m., Herrera told "Radio Traffic" as to "1026": "Negative probation. DL's suspended." "Radio Traffic" replied: "We're going [to] have him [unintelligible] right now for possible 11378. [¶] . . . [¶] [a]nd 653k."

Defense counsel argued defendant's detention was unlawful because (1) the officers were on the wrong block; (2) the male suspect had already left and the female victim had walked away; (3) the 911 tape recorded an officer stating he was on Holly Drive and did not see the male's silver vehicle; (4) neither defendant nor his companion fit the description of the male suspect as "short hair, maybe bald"; and (5) defendant notified the officers he was not on probation or searchable. The trial court asked how far 19 West Whittier Avenue was from 19 East Whittier Avenue; the prosecutor answered correctly: "One block."

The trial court denied the defense motion, reasoning as follows:

"I think there are a couple of significant factors. First of all, the officer said we were within a block or two of the location when they received the call. And it took them

8

a minute or two to get to the location. And the D.A. asked why did you stop the defendant and he said because I wasn't sure if he was one of the people involved or not.

"There are a number of discrepancies here. We have on the tape, 'bald head' for the suspect. The defendant does not have a bald head. One officer thought--from a distance, he thought he looked like a woman because he does have long hair. And also we have the issue of the--in the middle of all of this, the original caller says that . . . the woman had taken off and walked away and the male had driven off in another automobile.

"So apparently the officers did not hear that information and perhaps this is because this is all going on as they are getting out of the vehicle and going to the scene.

"So they go to the scene and they see the suspect. Officer Pasquale sees the suspect and he sees the parked white vehicle, two people near it, and the call had said one was possibly armed with a crowbar. One person, Officer Pasquale says, was waving his arms and then the other person started walking fast towards the house, that was the defendant. Officer Pasquale said, 'Stop. Police.' He said that two times and he saw him with something in his hand. It turns out to be a wallet.

"So Officer Pasquale intercepted him before he got into the house. So why did Officer Pasquale do this? Because he said he didn't know who the defendant was, if he was involved in this or not.

"So this, I think, is an [*In re Tony C.* (1978) 21 Cal.3d 888 (*Tony C.*)] situation. Now, we have that other issue of the fact that it was aired, that the apparent suspect had left, the apparent victim had left, but--but Officer Pasquale, just on the issue of *Tony C.* . . . , does the officer--is there, I think it's rational suspicion that some criminality--criminal activity is afoot and also that the defendant is connected with it.

"So here the officer has this information that possible criminal activity . . . has been taking place at this location or certainly within a block of this location. He sees a white car. He sees two people there. He thinks that one of them might be a woman. And

9

this is not just a slow moving situation. It sounds as though it's a fast moving situation. The officers get[] this dispatch, they are close. They immediately get to the scene and-- within a minute or two. So it's pretty fast.

"They see someone who may be that person. They know that there's a weapon involved or could be a weapon involved, a crowbar, and so the officer stops the defendant.

"So the question is: Is there . . . enough for a . . . *Tony C.* detention? I think the answer is, yes, there is. Because the officer has information that this criminal activity is going on and it appears that the defendant could be involved in it.

"The issue is not that he was involved in it beyond a reasonable doubt, but that . . . there's a reasonable likelihood that he was or even a reasonable possibility. I think it's one of the lowest standards in law to make a detention. And here I think the officer did just what the officer should have done and what was reasonable. He had him stop.

"The next thing that happened was the defendant was patted down for weapons. To make a [*Terry v. Ohio* (1968) 392 U.S. 1, at page 27 [20 L.Ed.2d 889, at page 909] (*Terry*)] pat down, the officer has to have specific articula[t]able facts explaining why he thinks the suspect might have a weapon.

"Well, here, number one, it was stated that he might have had a crowbar, but, more importantly, at this point when Officer Pasquale came in contact with the defendant, he saw a . . . metal clip and, in his experience, this metal clip is often connected to pocket knives. So I think that that is adequate for the officer to make a stop or a frisk under [] *Terry*.

"And there is testimony to the effect that, 'I want to search you,' and the defendant put up his hands and sort of a surrender position . . . I don't think that this . . . can be justified as a permissive search, but I think that the officer was justified under *Terry* [] in patting the suspect down for weapons.

10

"So he pats him down or the other officer pats him down and they find a gravity knife, which is illegal. The defendant is arrested. Then they perform a search incident to arrest and find suspected methamphetamine.

"So the next issue is what is the effect of the information that . . . both people involved in this original disturbing the peace had left the scene, in fact. I would say that if there was a significant amount of time that had gone by, that this . . . would mean that the officer had no reason at all to detain the defendant or search him, much less search [*sic*] him. But, here, because of the timeframe, the fact that it took place so quickly, things were moving so quickly and the officer did not say that he was aware of this information, that . . . the two people involved had left the scene. So . . . I can picture this situation as being an excited time, a time of excitement, fast action, and I think that--what should the officer do? The officer can't just jump into something without thinking about it, but here I think the officer did everything the officer should have done.

"The fact that apparently the suspect or the original suspect had left the scene, the officer was unaware of. So, subjectively, the officer certainly had probable cause to stop the defendant and frisk him and eventually search him.

"I don't think the officer was . . . acting in bad faith at all. I think the officer was acting in good faith. I think it's a situation where events took place that if the officer could have sat back and slowed down and went over all the dispatches before he did any of this, maybe the officer would have said, 'Well, this isn't the man we were looking for,' but he didn't have that luxury. He had to operate with the facts as he had them. And, under this set of facts, I think it's appropriate for the officer to act the way he did.

"So I will deny the 1538 motion."

## DISCUSSION

On review of a ruling denying a motion to suppress evidence, we view the facts most favorably to the respondent and uphold the trial court's factual findings if supported

11

by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673; *People v. Watkins* (2009) 170 Cal.App.4th 1403, 1408.) However, we decide independently whether the search or seizure was reasonable under the Fourteenth Amendment. (*People v. Weaver* (2001) 26 Cal.4th 876, 924.)

Defendant contends his motion to suppress should have been granted because: (1) Corporal Pasquale detained him without a warrant. (2) Corporal Pasquale "failed to consider information that reduced suspicion of [defendant's] involvement in criminal activity"--i.e., information supposedly available to him when he arrived at 19 East Whittier Avenue, which would have ruled out defendant as a suspect in the reported altercation. (3) Corporal Pasquale detained defendant based on facts that did not raise an objectively reasonable suspicion of defendant's involvement in criminal activity. (4) Defendant's sex and race did not justify the detention. (5) Defendant's attempt to walk away from Corporal Pasquale did not justify the detention. (6) Corporal Pasquale did not corroborate the information disclosed in the anonymous tip (i.e., the 911 call). (7) The anonymous tip did not describe an ongoing public danger. (8) Defendant did not consent to the seizure of his knife. (9) No circumstances attenuated the taint of the illegal detention. We are not persuaded.

Defendant's argument stands or falls on point 2: if that fails, the remaining points are incorrect or immaterial. As we shall explain, point 2 improperly demands de novo review of the trial court's factual findings based on a detailed factual argument that was not raised below, and misstates the amount of information reasonably available to Corporal Pasquale at the relevant time. Reviewing the court's factual findings in light of the evidence presented and the arguments made at the hearing, we conclude substantial evidence supports the finding that Corporal Pasquale could not have heard and processed all the exonerating information defendant now relies on.

For the first time on appeal, defendant offers a blow-by-blow account of events up to the moment he started walking away from the officers, trying to prove that Corporal

Pasquale heard but inexplicably "ignored" information that would have ruled out defendant as a suspect in the reported crime.

But even assuming the contention is properly raised now, it is unpersuasive. Some information defendant cites does not appear to have been broadcast timely, or at all. As for the rest, defendant does not convincingly explain why the trial court could not properly have credited Corporal Pasquale's testimony that he and his fellow officers could not take in all the incoming information while simultaneously dealing with the situation in front of them.

Defendant starts with the obvious: the officers went to East Whittier Avenue instead of West Whittier Avenue. However, where they went was only a block from the reported site, reachable by a single wrong turn, with address numbers that corresponded to those on the right block. On arriving, they saw a parked white sedan with two persons standing beside it in the street, who at first sight could have been a man and a woman--all consistent with the dispatch. Rushing to respond to an emergency call that suggested imminent physical danger to the victim, the officers could easily have missed or misheard the word "West" while they focused on locating the reported address number and finding out what was going on. Their mistake does not show that Corporal Pasquale willfully disregarded evidence exonerating defendant.

Defendant asserts that dispatcher Herrera described the male suspect as wearing a T-shirt and shorts, not the "pants and a dark shirt" worn by defendant, at 2:26:45 p.m., "over five minutes prior to an officer's first report of contact with Lamar" and "well before Pasquale saw" defendant. This evidence does not establish that Corporal Pasquale heard and ignored anything tending to exonerate defendant. Herrera's 2:26:45 p.m. statement did not give any colors for the suspect's clothing. And the officers' "first report of contact with Lamar"--i.e., calling in his name, which they did not know to begin with--could not have been made until a substantial time after they arrived at the scene;

13

thus, the fact that "over five minutes" separates Herrera's dispatch from the officers' call tells us nothing helpful to defendant's argument.

Defendant asserts that Corporal Pasquale relied on Herrera's description of the white sedan parked at the scene, but ignored his description of the male suspect's clothing, which was given at the same time. However, as defendant acknowledges, his companion, Lamar, was wearing clothing that fit that description (shorts and a white "wife-beater" T-shirt). In any event, Corporal Pasquale could reasonably have chosen to focus on the parked car, which appeared to confirm the location, before trying to figure out whether the descriptions of the persons involved in the alleged altercation precisely matched the appearance of the persons on the scene, or which person, if either, was the alleged perpetrator.

Defendant asserts that Corporal Pasquale ignored information broadcast by Herrera at 2:27:29 p.m. that the alleged victim was wearing a black skirt and a gray shirt. However, even assuming the officers heard that dispatch, they had no way of knowing then whether the persons they had heard about were the only ones involved in the alleged altercation.

Defendant asserts that Corporal Pasquale ignored information regarding the location of the victim's car. According to defendant, at 2:29:02 p.m., Herrera stated that it had been left at 19 West Whittier Avenue, but the car the officers saw was at 32 East Whittier Avenue. In fact, Herrera did not give any specific address in that dispatch. He said only: "The vehicle is still there."

Lastly, defendant asserts that Corporal Pasquale ignored Herrera's dispatch at 2:29:02 p.m. that the suspect had driven from the scene in a silver, two-door car, heading toward Holly Drive. Corporal Pasquale did not ignore this information. At 2:30:13 p.m., a speaker who could only have been Corporal Pasquale or his partner replied that the officers had not seen that vehicle coming southbound on Holly Drive.

14

In short, no evidence cited by defendant undermines the trial court's finding that the officers, while responding to a reported emergency, could not reasonably have been expected to hear and process every discrete piece of information that came in at separate times over the radio. But even if they had been able to do so, they had no way of determining whether that information was complete and accurate other than to investigate what they found on the scene as quickly as possible. Defendant's 20/20 hindsight is not the appropriate standard to apply to the question of whether the court's finding was supported by substantial evidence. We conclude that it was.

## II

In light of the above discussion, we need not discuss at length the remaining issues. As the trial court found, once the officers began to investigate the situation before them, which looked like the situation to which they had been dispatched, defendant's attempt to flee gave Corporal Pasquale grounds to perform a *Tony C.* stop. The officers' sighting of the metal clip in defendant's pants pocket, his initially evasive response to questioning about it, and his ultimate admission he was carrying a knife gave the officers further reasonable suspicion of criminal activity, justifying a *Terry* search. Finally, the discovery of an illegal switchblade knife on defendant's person created probable cause to arrest him. Defendant does not dispute that if those actions by the officers were lawful, the search incident to arrest which discovered methamphetamine on his person was also lawful.

### *The Tony C. Stop*

After the officers, in full uniform, approached defendant (reasonably, if mistakenly, thinking him a possible suspect in a recent crime), and he began to walk very quickly away from them toward the front door of a house, disregarding two commands to stop, while carrying an unidentifiable object in his closed hand, the officers had objectively reasonable grounds for suspicion that he might be involved in criminal

15

activity, justifying a brief investigative detention. (*Tony C.*, *supra*, 21 Cal.3d at pp. 892-893; see also *People v. Hernandez* (2008) 45 Cal.4th 295, 299; *People v. Souza* (1994) 9 Cal.4th 224, 231-235 (*Souza*) [flight from police a proper consideration as to propriety of detention, though not dispositive].) Even if the circumstances observed by the officers might have had an innocent explanation, they could still give rise to reasonable suspicion sufficient for a *Tony C.* stop. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 146; *Souza*, at p. 242.)

Defendant disagrees, relying on *Tony C.*; *Williams v. Superior Court* (1985) 168 Cal.App.3d 349 (*Williams*); *People v. Durazo* (2004) 124 Cal.App.4th 728 (*Durazo*); and *People v. Perrusquia* (2007) 150 Cal.App.4th 228 (*Perrusquia*). His reliance is misplaced.

In *Tony C.*, the officers detained the defendant while he was merely walking along the sidewalk; they had no particularized basis for suspecting his involvement in any crime, but only "a combination of hunch and curiosity." (*Tony C.*, *supra*, 21 Cal.3d at pp. 896-898.) But here, the officers were responding to a 911 call made a very short time before, and reasonably though mistakenly believed the persons they found at the scene could have been the persons described in the dispatch. And defendant's attempt to evade the officers created further grounds for reasonable suspicion which were absent in *Tony C.* (*Souza*, *supra*, 9 Cal.4th at p. 242.)

In *Williams*, the officer mixed up the descriptions of suspects in two different dispatches to produce a "composite description" that appeared to match the defendants, who were not doing anything illegal or suggestive of illegality when the officer detained them; however, the officer's "composite description" differed grossly from the actual descriptions of the suspects in the prior dispatches. (*Williams*, *supra*, 168 Cal.App.3d at pp. 360-362.) As we have shown in part I, the discrepancies between the descriptions of the suspects given in the 911 call and the appearance of defendant and Lamar were not so gross, and some of those discrepancies could not have been known to the officers because

they were not broadcast over the radio or because the officers were already out of the car investigating the scene.

In *Durazo*, the officer detained two young Hispanic males merely for apparently looking toward an apartment complex where four days earlier a resident had claimed Mexican gang members were going to attack him; as in the previous cases, the detained persons did not do anything suggestive of criminal activity within the officer's view. (*Durazo*, *supra*, 124 Cal.App.4th at p. 738.) Here, the officers responded almost immediately to a reported criminal assault and found people on the scene who, judging from the initial information given to the officers, looked as though they could have been involved in that assault.

Finally, in *Perrusquia*, the defendant was observed late at night in his car, running his engine in the parking lot of a store in a high-crime area where there had been a string of robberies; he was parked near the exit although there were available spaces closer to the store; when an officer approached, the officer heard something in the car, and the defendant tried to avoid contact with the officers. Nothing showed that the defendant matched the physical description of the alleged robbers, and he was not seen doing anything suggestive of criminal activity. (*Perrusquia*, *supra*, 150 Cal.App.4th at pp. 233-234.) Here, there was a far more immediate (apparent) connection than in *Perrusquia* between defendant and the alleged perpetrator reported in the 911 dispatch, and defendant's attempt to flee reinforced that suspicion.

*The Terry Search*

When an officer does not have probable cause to arrest, he may undertake a pat down search only if he has reason to believe that he is dealing with an armed and dangerous person, and the scope of the search must be confined to an intrusion reasonably designed to discover hidden weapons that could be used to assault an officer. (*Terry*, *supra*, 392 U.S. at p. 29 [20 L.Ed.2d at p. 911].)

17

"The officer must be able to point to specific and articulable facts together with rational inferences therefrom which reasonably support a suspicion that the suspect is armed and dangerous." (*People v. Dickey* (1994) 21 Cal.App.4th 952, 955-956.) But where the officer can do so, "[t]he judiciary should not lightly second-guess a police officer's decision to perform a patdown search for officer safety. The lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations." (*Dickey*, at p. 957.)

Here, the officers had specific and articulable facts to justify a *Terry* search, even before defendant admitted possessing a knife on his person. They saw a metal clip in defendant's pants pocket. They knew from their training and experience that such a clip can hold a concealed knife in place. When they asked him whether he was carrying any weapons, he replied evasively that he was "not searchable." At that point, they already had sufficient grounds for reasonable suspicion that he was armed and dangerous.

Defendant offers no contrary argument. He contends only that his detention was illegal and that he did not consent to the seizure of his knife. Since his detention was legal and a *Terry* search was justified, his lack of consent is immaterial.

As previously noted, defendant does not argue that the officers lacked probable cause to arrest him once they found the illegal knife, or that the subsequent search incident to arrest which found the methamphetamine on his person was unlawful.

DISPOSITION

The order denying defendant's motion to suppress evidence, and, thus, his conviction, is affirmed.

       HULL       , Acting P. J.

We concur:

     MURRAY     , J.

     DUARTE     , J.