Filed 12/30/14  In re J.S. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.S.,<br><br>        Defendant and Appellant. | A140137<br><br>(Solano County<br>Super. Ct. No. J40413) |

J.S. appeals from orders entered against him in this proceeding under Welfare and Institutions Code section 602. He contends (1) the juvenile court erred in denying his motion to suppress because the police detained him without a reasonable suspicion of criminal activity, and (2) the court's finding that J.S. committed robbery was not supported by substantial evidence. We will affirm.

## I.  FACTS AND PROCEDURAL HISTORY

In July 2013, a petition filed under Welfare and Institutions Code section 602 alleged that J.S., age 17, committed two counts of armed robbery. (Pen. Code, § 211.)

### A.  J.S.'s Motion to Suppress Evidence

J.S. filed a motion to suppress evidence of an in-field show-up and identification, as well as observations made by police after he was detained, on the

1

ground that the police lacked reasonable suspicion to detain him and probable cause to arrest. (Welf. & Inst. Code, § 700.1.) The evidence admitted at the suppression hearing including the following.

### 1. The Armed Robbery

In the afternoon of July 14, 2013, victims Andrew, Reid, Alyssa, and Ashley were walking on a pedestrian bridge that crossed over Air Base Parkway (Air Base) in Fairfield. As they came off the bridge and proceeded into an aqueduct to view graffiti, they were glared at by two Black teenagers who had just run across Air Base from the Parkway Gardens housing complex.

When Andrew led his three friends back out of the aqueduct, he "got hit with one side of a weapon across [his] eye." A robber with a short "buzz cut" hairstyle pointed a gun in Andrew's face, which was gushing blood, while an unarmed robber was "grabbing all the stuff" from his pockets, including his cell phone and cigarette lighter.

Both robbers also yelled at Reid, Alyssa, and Ashley to empty their pockets and hand over their cell phones. Reid gave the unarmed robber his phone.

The robbers then ran back across Air Base. (Andrew testified that the robbers ran toward a gate and he assumed they proceeded across Air Base; Reid testified that he actually saw the robbers run across Air Base.) Andrew and his friends went to a nearby house and called police.

### 2. Police Investigation

Fairfield Police Officer Gene Carter was the first officer to speak with the victims, about 10 minutes after the dispatch report. Reid described the armed robber as being about 18 years old, with short hair, wearing a black T-shirt and baggy black jeans. Reid described the unarmed robber with a hairstyle of "a brown/orange color on the back of the head," wearing a black beanie, a black T-shirt, and baggy light-blue jeans. Officer Carter broadcast the description to other officers.

2

Fairfield Police Sergeant Brett Morris and his partner received the following description of the two robbery suspects, consistent with what Reid had told Officer Carter: "[T]wo 17-to-18-year-old black male . . . juveniles. One armed with a handgun that was like a silver semiautomatic. [¶] [The armed suspect was] described as being thin to average build; approximately 18 years old; black male . . . wearing a dark black T-shirt and darker black jeans . . . . [¶] The other suspect was said to be an unarmed 17-year-old black male juvenile. He had a dark beanie; a black T-shirt; light-colored blue jeans; and . . . an orange-colored patch on the back of his head, in his hair."

Sergeant Morris and his partner proceeded to the area of the pedestrian bridge, on the side of Air Base opposite to the robbery location, where the suspects were said to have gone.[1] They then received new information that the robbers had run in the direction of Parkway Gardens, run through a back fence of Parkway Gardens, and were possibly inside Parkway Gardens.

### 3. Detention of J.S., M.R., and a Third Minor

Entering the Parkway Gardens housing complex, Sergeant Morris immediately observed three Black male teenagers, later identified as J.S., M.R., and a third minor (S.M.) sitting on a metal cage or "standing in close proximity to each other, very close." According to Sergeant Morris, about 15 minutes had elapsed since he received the dispatch of the robbery, and the individuals were about "a half-mile to a quarter of a mile" from the robbery location.

Sergeant Morris testified that as he approached the boys, "The thing that stuck out at me is one of them had an orange patch on the back of his head," which was consistent with the description of the unarmed suspect. This individual, later identified as M.R., was also wearing dark clothing consistent with the description of the robbers. M.R. was not wearing a beanie, but he was the only person Sergeant Morris saw in the

---

[1]     Reid told the police the robbers had run across Air Base, but not specifically that they were going toward Parkway Gardens; Reid heard Andrew tell the police something about "Parkway," but Andrew denied telling the police he saw the robbers run toward Parkway Gardens specifically.

3

area with an orange patch of hair on the back of his head. In addition, M.R. appeared "nervous." The other two Black males, in their late teens or early twenties, were also wearing dark clothing.

About 3:10 p.m., Sergeant Morris and other officers detained and handcuffed J.S., M.R., and S.M., and placed them in separate police cars. About 22 minutes had elapsed since the officers heard the first dispatch about the crime. Sergeant Morris summarized the factors that led him to detain the three youths as follows: "The major factor was the orange patch on the back of the head. That was the initial alert that I got. And the clothing description. And the fact that there was information indicating that the suspects had run into the back fence of Parkway Gardens, and so I knew they were in the area."

None of the detainees had a gun or the victims' stolen property. None of them was out of breath, which was not surprising to Sergeant Morris since roughly 20 minutes had passed from the time they were observed running from the robbery scene, and it would take a teenager about five or six minutes to run three-quarters of a mile.

4. In-Field Show-Up and Identification of J.S. and M.R.

About 15 to 20 minutes after they were robbed, Andrew and Reid were driven in separate patrol cars to Parkway Gardens to look at three male teenagers who had been detained as potential suspects. The victims were read the in-field admonition and said they understood it.

At the show-up, the three suspects, detained in separate police cars, were removed one at a time. From about 40 to 50 feet away, in broad daylight, Andrew and Reid each identified J.S. and M.R. (but not S.M.) as the two robbers. They recognized J.S. and M.R. primarily by their faces rather than their clothes, noting that J.S. and M.R. were no longer wearing jackets or hoodies, and M.R. was not wearing a beanie.

Andrew identified J.S. as the armed robber, based on "[t]he way he was standing, acting towards all of us," as well as his black T-shirt and jeans. Andrew

4

testified that he told Officer Perry he was "75 to 100 percent sure" J.S. was the armed robber. (Officer Perry testified that at the show-up, Andrew said he was "60 percent" certain that J.S. was the armed robber.)

Reid also identified J.S. as the armed robber. At the suppression hearing, Reid testified that he was "75 to 80 percent sure it was him." (Officer Carter testified that at the show-up, Reid said J.S. "resembled" the armed robber, "but he could not be 100 percent sure.")

J.S. and M.R. were arrested.

### 5. Defense Investigator's Photographic Lineup

Reid testified that some weeks after the robbery, J.S.'s defense investigator showed him a photographic lineup with six close-up photographs of faces. Reid chose photograph number four, which was not J.S.

### 6. Identification of J.S. and M.R. at the Suppression Hearing

By the time of the suppression hearing, J.S. and M.R. had attempted to change their appearance: both of them cut their hair, and J.S. was now wearing glasses and a beard.

Nonetheless, Reid and Alyssa each identified J.S. as the armed robber. Reid confirmed that the armed robber was Black, darker-skinned than the other robber, slender, and had been clean-shaven, with short hair, wearing dark baggy jeans and a dark shirt.[2]

Andrew did not identify J.S. in court, but recalled that the armed robber had short hair and wore a black shirt or hoodie and baggy blue jeans.

All three witnesses identified M.R. as the unarmed robber with the lighter skin, who searched through Andrew's pockets. Andrew recalled the unarmed robber was "wearing a beanie, had kind of an orange tint on the bottom half of his hair like it was

---

[2]    However, Reid also said that the armed robber was wearing a T-shirt and had a visible tattoo on the inside of his right arm. Alyssa, who was "5-7 and a half," recalled that the armed robber was "a little bit taller," was wearing a white T-shirt, and had "a tattoo on his arm that he was holding out with the gun." M.R. had tattoos on his arms.

bleached," and was wearing "a zip-up hoodie . . . and light blue bagg[y] jeans." Reid testified that the unarmed robber was of "mixed" race, lighter-skinned than the gunman, wore dark clothes and a beanie, and had a bleached "duckbill" at the back of his head under the beanie. Alyssa described M.R. as the unarmed robber with the lighter skin color, "wearing a black hoodie . . . a beanie, and he had orange hair, like a tail."

### 7. Surveillance Video

A city surveillance video of an intersection in front of the Parkway Gardens housing complex depicted two men walking on the sidewalk in front of the complex and in the opposite direction of the pedestrian bridge at about 2:01 p.m. on the day of the robbery. The men were wearing black T-shirts and dark-colored jeans, but neither was wearing a hoodie.

### 8. Defense Witnesses

J.S. rested on the state of the evidence. M.R. called a barber who testified that a current popular hairstyle for boys was to shape the back of the hair into a "duckbill" with bleached tips.

### 9. Juvenile Court's Ruling

The juvenile court denied the suppression motion.

### B. Jurisdictional Hearing and Order

The matter proceeded with the minors' witnesses for the jurisdictional hearing in both J.S.'s case and M.R.'s case.

Eugene Borghello, investigator for J.S., determined that the distance between the pedestrian bridge and the Parkway Gardens housing complex is 0.47 miles. Borghello took the photographs he used in the lineup he showed Reid, and Reid did not choose J.S.'s photograph, did not describe the unarmed robber as light-skinned or of mixed race, and said both robbers had body types similar to his build—about six feet two inches and 200 pounds.

Les Durfee, investigator for M.R., testified that M.R.'s booking sheet indicated he was not wearing a hoodie or beanie and his jeans were gray rather than light blue. M.R.'s mother testified that she overheard Andrew tell Reid, before being called into the courtroom, that "one of them is mixed."

The court took judicial notice that M.R. had tattoos on his arms near the inside "crook" of each elbow.

In its jurisdictional order, the court found true the two robbery counts as to J.S. and M.R.

### C. Disposition Order

The court continued J.S. as a ward of the court, determined that both of the sustained robbery counts were felonies, and committed him to the Division of Juvenile Justice for a maximum commitment term of six years.

This appeal followed.

## II. DISCUSSION

As mentioned, J.S. contends the court erred in (1) denying his motion to suppress and (2) finding that he committed robbery.

### A. Motion to Suppress; Reasonable Suspicion for Detention

J.S. argues that the court erred in denying his motion to suppress because Sergeant Morris detained him without a reasonable suspicion that he had been involved in criminal activity. We review the court's factual findings for substantial evidence and decide de novo whether, on those facts, the requisite legal standard was met. (*People v. Parson* (2008) 44 Cal.4th 332, 345.)

#### 1. Reasonable Suspicion

For a detention to be lawful under the Fourth Amendment, the officer must be able to point to specific and articulable facts that, giving due weight to the reasonable inferences the officer may draw from those facts in light of experience, reasonably warrant the intrusion. (See generally *Terry v. Ohio* (1968) 392 U.S. 1, 21; *People v. Souza* (1994) 9 Cal.4th 224, 230 (*Souza*).) In particular, an officer may stop and detain a

7

person for questioning or limited investigation if the officer has a "reasonable suspicion," based on specific and articulable facts, that some activity relating to crime has taken place or is occurring or is about to occur, and the person he intends to stop or detain is involved in that activity. (*United States v. Sokolow* (1989) 490 U.S. 1, 7-8; *Souza, supra*, 9 Cal.4th at p. 231 ["A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity"].)

By the time Sergeant Morris detained J.S., M.R., and their companion, he was aware of the following articulable facts: (1) the suspects were found standing closely together at the Parkway Gardens housing complex, where the robbers were reportedly heading, about 20 minutes after the robbery; (2) M.R. matched the description of one of the robbers, in that he had a distinctive orange or yellow duckbill hairstyle; (3) M.R. was the only individual Sergeant Morris had observed during his search for the robbers who had this hairstyle; and (4) all three of the suspects matched the description of the robbers, in that they were Black juvenile males wearing dark clothing. In addition, when Sergeant Morris approached, M.R. appeared nervous.

Under the totality of these circumstances, Sergeant Morris had a reasonable suspicion that M.R. and at least one of his two companions—including J.S.—were involved in a crime. The race, gender, approximate age, and dark clothing of the trio, as well as the distinctive orange duckbill hairstyle of one of the teens, their presence in the area to which the robbers reportedly fled, just 22 minutes after the robbery and no more than three-quarters of a mile away from the crime scene, collectively justified a temporary brief detention for investigative purposes. A reasonable suspicion may arise if an individual matches a general description given by an eyewitness where, as here, the individual is found in the vicinity of recent criminal activity. (*People v. McCluskey* (1981) 125 Cal.App.3d 220, 226 [reasonable suspicion to stop vehicle traveling from area of robbery reported minutes earlier, where the officer thought the passenger, a 20-year-old Mexican male with dark hair and a dark jacket, matched the description of a robber as

a 19- to 21-year-old Mexican male with brown hair and blue jacket].) Furthermore, it was reasonable to detain not only M.R., with the distinctive hairstyle, but also his companions J.S. and S.M., since both met the description of the second (armed) robber—a Black teenage male in dark clothing with shorter hair.

### 2. J.S.'s Arguments

J.S. contends he was unlawfully detained because the victims merely described the perpetrators as Black males wearing dark clothing, a description that would fit many residents of the Parkway Gardens housing complex. But that is incorrect. The detention of J.S. was not based solely on his race, gender, or clothing; it was also—and primarily—based on his close proximity to the suspect with the distinctive orange duckbill hairstyle that the victims had just reported.

J.S. next argues that, although the unarmed robber had a duckbill hairstyle like M.R., there was no "evidence" (i.e., facts known to Sergeant Morris at the time) that J.S. was *with* M.R. during the robbery. But there was: J.S. was found with M.R. about 20 minutes after the robbery, and he matched the general description of the armed culprit who helped M.R. rob the victims.

J.S. further argues there was no evidence that M.R.'s duckbill hairstyle was unusual for his demographic, and there were conflicting descriptions of M.R.'s hair as blond or orange and conflicting evidence as to whether the robbers were seen heading toward the Parkway Gardens housing complex. However, Sergeant Morris did not have to possess proof beyond a reasonable doubt to conduct an investigative detention. His observation that M.R.'s hairstyle (as well as his race, gender, and approximate age) matched the victims' description of one of the robbers, minutes after the robbery, in a location the officer learned the robbers had possibly headed, provides substantial evidence to support the court's finding that he possessed a reasonable suspicion sufficient to detain M.R. as well as J.S., who was found with M.R. and fit the general description of the armed robber.

The cases on which J.S. relies are therefore inapposite. In *Williams v. Superior Court* (1985) 168 Cal.App.3d 349, it was held that an officer could not rely on his incorrect recollection of the suspect descriptions in two robberies reported a day or week earlier to justify his detention of Black males in their mid-twenties who were driving a newer white sedan and who stared at a passing patrol car. (*Id*. at pp. 360-361.) Here, by contrast, Sergeant Morris relied on his *correct* recollection of suspect descriptions in a robbery reported *minutes* earlier to justify his detention of Black male teenagers in dark clothing, one of whom had a *distinctive* orange or yellow duckbill hairstyle.

In *In re Tony C.* (1978) 21 Cal.3d 888, a highway patrol officer stopped two Black youths walking on the sidewalk in the middle of the day because, the day before, he had "learned informally that several burglaries had been reported" in the area and " 'three male blacks' were being sought." (*Id*. at p. 896.) Here, by contrast, the detention was based not on the mere fact that the suspects matched a vague description of Black males of unspecified age who supposedly committed crimes at least a day earlier, but on the fact that M.R. matched a more specific description and he and J.S. were wearing the type of clothing worn by the perpetrators of a robbery that had occurred just minutes earlier at a location less than a mile away.

J.S. nonetheless urges that, because he was described as a Black male juvenile wearing dark clothing, his case is "markedly similar" to *People v. Collins* (1970) 1 Cal.3d 658 (*Collins*), *People v. Durazo* (2004) 124 Cal.App.4th 728 (*Durazo*), *People v. Pitts* (2004) 117 Cal.App.4th 881 (*Pitts*), *People v. Bailey* (1985) 176 Cal.App.3d 402 (*Bailey*), and *People v. Davis* (1979) 88 Cal.App.3d 732 (*Davis*). Not so.

*Collins* is inapposite because the court expressly declined to decide the validity of the detention. (*Collins, supra*, 1 Cal.3d at p. 661.) The case is also distinguishable because the suspect was described several days earlier only as a "male Negr[o], six foot, 160 pounds." He was not described as accompanying an individual with a distinctive hairstyle.

10

As to *Durazo*, *Pitts*, *Bailey*, and *Davis*, none concerned the investigation of an armed robbery of multiple victims that had occurred minutes earlier, where the victims' descriptions of the suspects included one suspect's distinctive duckbill hairstyle, and the victims indicated the direction of the perpetrators' departure from the scene. (*Durazo, supra,* 124 Cal.App.4th at pp. 732-733 [unverified phone call that "Mexican gang members" threatened to come to an apartment the next morning did not justify the stop of a car, four days later, containing two young Hispanic-appearing males who looked in the direction of the apartment building as they drove past and appeared to obey traffic laws so as not to be pulled over by police]; *Pitts, supra,* 117 Cal.App.4th at pp. 884-889 [stop of individuals not justified by officer's "hunch" that he was involved in drug trafficking based on area's reputation for drug trafficking and a police bulletin relating month-old information from an untested informant that the individual was involved in drug trafficking]; *Bailey, supra,* 176 Cal.App.3d at pp. 404-405 [no reasonable suspicion where defendant was sitting in his car in the parking lot of a closed store in an area where people sat in cars to ingest drugs]; *Davis, supra,* 88 Cal.App.3d at pp. 734-735 [stop of individuals standing by a car was not justified by the fact the car was blocking other unoccupied vehicles at a late hour near a motel].)

J.S. fails to establish that the court erred in concluding there was reasonable suspicion for an investigative detention.[3]

B.  Substantial Evidence of Robbery

Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. (Pen. Code, § 211.)  Here, it is undisputed a robbery occurred, but J.S. contends there was insufficient evidence to support a finding that he was one of the

---

[3]  Assuming his detention was unlawful, J.S. contends his identification at the show-up should have been suppressed because it "followed an immediate, logical and causal progression, without any intervening act [to dissipate] . . . the taint of the illegal detention."  Because the detention was lawful, we need not address this issue.

robbers.  We review for substantial evidence.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318; *People v. Johnson* (1980) 26 Cal.3d 557, 576.)

### 1.  Substantial Evidence

At the in-field show-up shortly after the robbery, Reid and Andrew identified J.S. as one of the two individuals who had just robbed them at gunpoint.  Andrew was either "60 percent" or "75 to 100 percent" sure that J.S. was the armed robber.  Reid was "75 to 80 percent sure it was him."  At the hearing, Reid and Alyssa identified J.S. as the armed robber.  The court expressly found that Reid was a credible witness.  (See *People v. Scott* (1978) 21 Cal.3d 284, 296 ["The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable"].)

In addition, the surveillance videotape—which the court reviewed "20 times" and "frame by frame"—corroborated the victims' descriptions and identifications of J.S. and M.R. as the robbers.  One of the individuals in the videotape was M.R., who was wearing a beanie as described by the victims.  The other individual was J.S., based on his pants and a gold chain, which Reid told the defense investigator the assailant was wearing.  The videotape therefore depicted J.S. and M.R. together about 40 minutes before the robbery near the Parkway Gardens housing complex and the general area of the robbery.  From this evidence, along with the rest of the evidence—including evidence that J.S. and M.R. were also found together *after* the robbery and J.S. matched the description of the armed robber—a trier of fact could reasonably conclude that J.S. and M.R. were the robbers and J.S. was the robber with the gun.

### 2. J.S.'s Arguments

J.S. notes there were inconsistencies in the victims' identifications of the robbers.  For example, an officer testified that Andrew was 60 percent sure of his identifications at the show-up, while at trial Andrew said he had been "75 to 100 percent" sure but was unable to identify J.S. in court.  Andrew further testified that the other robber, not J.S., was the one with the gun, but also said the robber with the gun was *not* the one with the

12

orange hair. Reid identified J.S. at the trial, but did not pick out J.S.'s photo from a photo array shown to him before trial by a defense investigator. The victims estimated the robbers to be around six foot two inches tall and 200 pounds, but J.S. was five foot eight inches and 145 pounds and M.R. was five foot nine. Reid and Alyssa said the armed robber had a tattoo on his arm, but it was M.R. who had a tattoo. Reid described the duckbill as blond rather than orange. And although Alyssa identified J.S. at trial, she had told the police she did not get a good look at the robbers.

These inconsistencies do not establish there was insufficient evidence to support J.S.'s conviction. (*People v. Hinton* (2006) 37 Cal.4th 839, 885 ["Conflicting evidence . . . does not establish that the evidence on one side or the other was insufficient"].) The court expressly considered and resolved the conflicts in the evidence in light of the credibility of the witnesses, and it is not our role to reweigh the evidence or the court's credibility determination. (See *Johnson, supra*, 26 Cal.3d at pp. 575-578.)

Lastly, J.S. points out that neither J.S. nor M.R. was found in possession of the stolen phones or the gun used during the robbery, tried to flee when the police approached, or was breathing heavily or sweating when the police found them. However, the existence of evidence arguably favorable to the defense does not preclude the conclusion that there was also substantial evidence to support the court's ruling. J.S. fails to establish error.

## III. DISPOSITION

The orders are affirmed.

13

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

BRUINIERS, J.