Filed 3/12/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JASON FELIX,<br><br>    Defendant and Appellant. | B317938<br><br>(Los Angeles County<br> Super. Ct. No. PA089324)<br><br>**ORDER MODIFYING OPINION**<br>**[No change in Judgment]** |

THE COURT:

    The opinion herein, filed on March 7, 2024, is modified as follows:

    On page 19 of the majority opinion, delete footnote 1.

    There is no change in the judgment.

_____

STRATTON, P. J.          GRIMES, J.          WILEY, J.

Filed 3/7/24 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>JASON FELIX,<br><br>    Defendant and Appellant. | B317938<br><br>(Los Angeles County<br> Super. Ct. No. PA089324) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David Walgren, Judge.  Affirmed with directions.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Jason Felix was arrested after being stopped for a traffic violation in Utah and a consensual search of his car resulted in the recovery of a handgun, ammunition and over five kilograms of methamphetamine. While in custody in Utah on drug charges, defendant became a suspect in two murders that occurred in Southern California. Upon his return to California, defendant invoked his right to counsel while being interviewed by the detectives investigating one of the murders. Afterward, he was placed in a cell with an undercover detective to whom he made incriminating statements about both murders. The trial court denied defendant's motion to suppress the evidence recovered during the Utah traffic stop and admitted, over his objection, his incriminating statements made to the undercover agent. A jury found defendant guilty of two counts of first degree murder.

On appeal, defendant contends the trial court erred in denying his motion to suppress the evidence recovered from the warrantless search of his car and in admitting his statements to the undercover agent because he had previously invoked his right to counsel while being interviewed by detectives. Defendant also contends he is entitled to an additional day of presentence custody credits, a point to which the People agree.

We remand with directions to the superior court to correct the presentence custody credits and prepare a new abstract of judgment. We otherwise affirm the judgment of conviction in its entirety.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.     The Murders**

On March 27, 2017, Ricardo Mota was fatally shot in his neck and chest with a .22-caliber gun. His body was discovered slumped over in the driver's seat of his car in the parking lot of a church in Montebello. At the time of his death, Mr. Mota was under

2

investigation for drug trafficking. Detective Richard Ruiz of the Los Angeles County Sheriff's Department was in charge of investigating the murder with his partner, Sergeant Robert Gray.

On June 15, 2017, Jorge Gonzalez-Ortega was fatally shot in the head with a .22-caliber gun. His body was discovered by his family in the converted shed where they lived behind an apartment complex in San Fernando. A bindle of methamphetamine, aluminum foil and tape were found at the scene. Detectives Michael Valento and Amber Montenegro were assigned to investigate that murder.

## 2. The Traffic Stop in Utah

Two days after the murder of Mr. Gonzalez-Ortega, defendant was stopped by Sergeant Charles Taylor of the Utah Highway Patrol. Defendant had been heading east on I-70 in southeastern Utah, close to the Colorado border, and he failed to slow down as he passed Sergeant Taylor who was parked on the side of the highway in a marked patrol car. Utah law requires drivers to slow down when passing any emergency vehicle.

In response to Sergeant Taylor's request for a license and registration, defendant provided a copy of an identification card issued in Mexico and registration indicating the white Lincoln MKZ he was driving was registered in California in the name of a third party (Ricardo M. Aguilera). Sergeant Taylor gave that information to his radio dispatcher. While awaiting a response to the records check, Sergeant Taylor questioned defendant. Sergeant Taylor eventually asked for and received consent from defendant to search the car. The search resulted in the discovery of two cell phones, a .22-caliber gun, magazine and ammunition, and 10 taped packages of methamphetamine. Defendant was arrested and charged with possession of methamphetamine with intent to distribute.

3

**3. The August 2017 Interview in Utah**

The investigations of the murders of Mr. Mota and Mr. Gonzalez-Ortega eventually led to the discovery of evidence, including surveillance videos, gun casings and fingerprints, indicating the two murders might be connected and that defendant was a possible suspect.

On August 1, 2017, Detectives Montenegro and Valento went to Utah to interview defendant in connection with the shooting of Mr. Gonzalez-Ortega.  Defendant was read his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436.  During the course of the interview, defendant admitted picking up drugs from Mr. Gonzalez-Ortega at his home and shooting him in the head.  Defendant said he shot him in self-defense.

**4. The September 2017 Interview in California**

After defendant was extradited to California, he was taken to the San Fernando Police Department.  On September 21, 2017, defendant was interviewed by Sergeant Gray and Detective Ruiz regarding the shooting of Mr. Mota.  Defendant was read his *Miranda* rights.  He did not immediately invoke his right to counsel.  Defendant answered some questions, mostly concerning general background information.  He also confirmed his cell phone number and said he had borrowed the Lincoln MKZ from a friend.  When shown photographs of the victim, Mr. Mota, and of a 15-year-old suspected accomplice in the murder, defendant denied knowing either one.  Defendant eventually invoked his right to counsel and the interview was concluded.

**5. The Undercover Operation**

Following the September 2017 interview, an undercover detective was placed in the same holding cell as defendant.  The undercover detective was wearing civilian clothes and acted like he was a fellow detainee.  He was wired to record audio of any

4

conversation. Defendant initiated a conversation with the undercover detective, asking him if he spoke Spanish. The undercover detective said yes and they began to talk about what led defendant to being in custody.

Defendant told the undercover detective he had been in custody in Utah on drug charges but the case had been "dropped." He said he had been transporting drugs ("ten pounds of crystal") and was on his way from Los Angeles to New York when he was stopped for a traffic violation.

Sergeant Gray and Detective Ruiz stopped by the cell and removed defendant. They told defendant they had received evidence pointing to his involvement in the murder of Mr. Mota. They returned defendant to the holding cell and told defendant to think about what they had told him.

After the detectives left, defendant resumed his conversation with the undercover detective. He said the detectives wanted him to "snitch" on some kid who had killed a man. Defendant eventually made incriminating statements about his involvement in the murder of Mr. Mota. He said the kid who did the shooting was 15 years old and had already killed six people. He had given the kid a nine-millimeter Beretta handgun and drove him to "do it" outside of a church. Defendant said he never touched Mr. Mota and his fingerprints were not on the gun because he cleaned it well before giving it to the kid. As for the shooting of Mr. Gonzalez-Ortega, defendant said there were no witnesses so he could say it was self-defense.

## 6. The Charges

Defendant was charged with two counts of murder. (Pen. Code, § 187, subd. (a).) As to the murder of Mr. Gonzalez-Ortega, it was alleged defendant personally used and discharged a firearm in the commission of the offense. (§ 12022.53, subds. (b)-(d).) As to the

5

murder of Mr. Mota, it was alleged a principal personally used and discharged a firearm. (§ 12022, subd. (a)(1).)

7.     **The Motion to Suppress**

Defendant moved to suppress all statements by Sergeant Taylor, the Utah highway patrolman who stopped him two days after the murder of Mr. Gonzalez-Ortega, and any other officer involved in the Utah traffic stop, all of defendant's statements during the detention and all items seized from the car. Sergeant Taylor, a 23-year veteran with the Utah Highway Patrol, testified for the prosecution at the hearing on the motion. The dashcam video from his patrol vehicle was played during his testimony and showed the entire encounter beginning with defendant driving by Sergeant Taylor's parked patrol vehicle in violation of Utah's "slow down" law.

Sergeant Taylor testified that when he first walked up to the Lincoln and spoke to defendant, he explained why he had pulled him over and asked for the requisite paperwork. Defendant gave him an identification or license card issued by Mexico and registration paperwork showing the car was registered in California to a third party. Defendant told Sergeant Taylor he was visiting the United States on vacation and had borrowed the car from a friend. Defendant said he was going to Salt Lake City to visit a friend.

Sergeant Taylor said he was suspicious of defendant's response because he had been driving eastbound in the southeastern part of Utah, almost at the Colorado border, and not headed in the direction of, or anywhere near, the vicinity of Salt Lake City. Defendant had already "passed four different highways that he could have taken [toward Salt Lake City], and the last one he passed [was] about 20 miles behind him."

6

Sergeant Taylor asked defendant to come back to his patrol car while he checked his records through the dispatcher. He had defendant sit in the front passenger seat next to him. Sergeant Taylor explained he often did that when a driver had foreign identification documents because it helped to have the person next to him so he could ask questions if he had difficulty deciphering the documents.

Sergeant Taylor gave the radio dispatcher defendant's name (Jason Axel Bugarin Felix), date of birth and a description of the white Lincoln he was driving. Sergeant Taylor explained that a records check involving a Hispanic name can be more complicated and time-consuming since Hispanics often have two middle names or surnames as was the case with defendant. The records search included attempting to verify defendant's identity, the registration on the Lincoln, and whether defendant had any outstanding warrants. Sergeant Taylor also requested that a Spanish-speaking officer come to the scene. He believed they were communicating well in English, but he felt it would be appropriate to have the assistance of a Spanish-speaking officer in case the need arose.

As they waited for a response on the records check, Sergeant Taylor continued to collect information relevant to writing a citation, including verifying defendant's height and weight and other biographical data. He also tried to verify the purpose of defendant's trip. It concerned him that defendant's story continued to change. Defendant told him he had no address or phone number for the friend he was supposed to be visiting. He then said the person was actually a friend of his girlfriend and when he got to Salt Lake City he was going to call his girlfriend, who lived in Las Vegas, and she would arrange their meeting. Then defendant said he was actually going to pick up some clothes for his girlfriend that

had been mailed from Mexico and that she could not do it because she had to work.

Sergeant Taylor said defendant's changing and often illogical answers continued to raise his suspicions, as did the fact that defendant seemed nervous. Sergeant Taylor could see his pulse beating in his neck. While they continued to wait on the records check, Sergeant Taylor asked defendant if he was doing anything illegal or transporting anything illegal, like drugs or guns. Defendant said no.

The dispatcher then reported to Sergeant Taylor that no state-issued license had come back for defendant using any variation of the names provided. There were records of defendant having made multiple border crossings and being involved in credit card fraud, but no outstanding warrants. At this point, the Spanish-speaking officer arrived on the scene and briefly spoke with defendant.

Sergeant Taylor testified he repeated some questions to defendant to confirm defendant's answers. He asked for and received confirmation from the dispatcher that it was not possible to run a check on the Mexican identification card. He asked the dispatcher to verify that a search had been done under the name of the registered owner of the Lincoln.

Sergeant Taylor said he decided to give defendant a warning instead of a citation and to ask for consent to search the car. He explained this portion of the dashcam video by saying, "So at this point I'm going to ask for consent. You hear me print off a warning, and along with that is a consent form that I've asked if he would fill out for me and sign." Defendant orally agreed the car could be searched. Sergeant Taylor explained to defendant that he was issuing just a warning and not a citation and returned his documents to him.

8

Sergeant Taylor then gave defendant the consent form which was written in both English and Spanish. He asked him to "[r]ead it and then sign here if you agree." Defendant reviewed the form for approximately two minutes and then signed it. At that point, the dispatcher responded that the further check on the Lincoln and its registered owner, Ricardo M. Aguilera, came back "inconclusive."

Sergeant Taylor proceeded with the search of the car which resulted in the discovery of 10 taped packages of methamphetamine (5.4 kgs.), a .22-caliber handgun, magazine and ammunition, and two cell phones.

The parties stipulated to various time stamps on the dashcam video relevant to the detention. Defendant did not present any witnesses or evidence. After entertaining argument, the court denied defendant's motion.

## 8. The Verdict and Sentencing

The jury found defendant guilty of two counts of first degree murder and found true the firearm use allegations as to both counts. Defendant was sentenced to 75 years to life plus one year, calculated as follows: consecutive terms of 25 years to life on each murder count, plus a consecutive 25 years to life for the personal firearm use enhancement on count 1 and a consecutive one-year term for the principal firearm use enhancement on count 2. The court awarded defendant 1,547 days of presentence custody credits.

This appeal followed.

## DISCUSSION

## 1. The Denial of Defendant's Motion to Suppress

Defendant contends the court erred in denying his motion to suppress because the traffic stop was unreasonably prolonged in violation of his Fourth Amendment rights, and his subsequent consent to the warrantless search of the car was invalid as a product of his wrongful detention.

9

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719.)  "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court." (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*).)

Here, the trial court found the prosecutor had proven a lawful detention for the traffic violation, Sergeant Taylor acted diligently in conducting his investigation, the detention was not unduly prolonged, and defendant's consent to the search of the car was voluntary and free from coercion.  We conclude substantial evidence supports those findings and agree that defendant's Fourth Amendment rights were not violated.

Defendant concedes his initial detention by Sergeant Taylor for the traffic violation was valid and did not violate his rights.  Indeed, the law is well settled that a "seizure for a traffic violation justifies a police investigation of that violation." (*Rodriguez v. United States* (2015) 575 U.S. 348, 354 (*Rodriguez*); *Arizona v. Johnson* (2009) 555 U.S. 323, 327, 333 [police may lawfully detain a vehicle and its occupants pending investigation of possible traffic violation].)

The first six minutes of defendant's detention consisted of Sergeant Taylor explaining to defendant why he had pulled him over, requesting identification and registration and asking where defendant was headed, all of which qualify as the type of ordinary inquiries an officer is allowed to conduct during a traffic stop.

10

(*Rodriguez, supra*, 575 U.S. at p. 355 [" 'ordinary inquiries' " include such things as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"]; *Tully, supra*, 54 Cal.4th at pp. 980–981.)

Sergeant Taylor gave the radio dispatcher the information he obtained from defendant to run a records check and also requested that a Spanish-speaking officer be sent to the scene. While awaiting a response from the dispatcher, Sergeant Taylor continued to ask questions relevant to writing a citation, including verifying certain biographical data. He also asked questions aimed at dispelling the reasonable suspicions raised by defendant's confusing answers for why he was in Utah and where he was headed, including asking whether defendant was transporting anything illegal.

These questions, including the ones not directly related to the traffic violation, were permissible and did not unlawfully extend the duration of defendant's detention as they occurred while Sergeant Taylor was awaiting a response on the records check. " 'Questioning during the routine traffic stop on a subject unrelated to the purpose of the stop is not itself a Fourth Amendment violation. Mere questioning is neither a search nor a seizure. [Citations.] While the traffic detainee is under no obligation to answer unrelated questions, the Constitution does not prohibit law enforcement officers from asking.' " (*People v. Gallardo* (2005) 130 Cal.App.4th 234, 239; *Arizona v. Johnson, supra*, 555 U.S. at p. 333 ["An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (Citation omitted.)].)

Defendant says the detention became illegal once the dispatcher provided a response to the records check and Sergeant Taylor continued to ask questions and detain him for another five to six minutes, instead of writing a citation or releasing him. We disagree with defendant's characterization of what transpired during this time period.

There is no bright-line rule establishing an outside time limit for traffic violation detentions. (*Williams v. Superior Court* (1985) 168 Cal.App.3d 349, 358.) "[T]he circumstances of each traffic detention are unique" and "the reasonableness of each detention period must be judged on its particular circumstances." (*Ibid.*)

The circumstances here involved a foreign national driving a car that did not belong to him. It was entirely reasonable, and within the scope of the appropriate inquiries for the traffic stop, for Sergeant Taylor to make further inquiries of the dispatcher regarding the registered owner of the car. It was also reasonable for Sergeant Taylor to take a few minutes to repeat some of his questions to defendant in the presence of the Spanish-speaking officer, who had only just arrived, in order to confirm that he had properly understood defendant's responses.

When Sergeant Taylor initially asked for consent to search the car, the lawful detention for the traffic violation was still ongoing. It did not end the moment the dispatcher gave the initial results of the records check to Sergeant Taylor. And it was not illegal for Sergeant Taylor to request consent from defendant. A separate reasonable suspicion of wrongdoing is not required to ask for consent to search during the course of a traffic stop. (*Tully*, *supra*, 54 Cal.4th at p. 982.)

Almost immediately thereafter, Sergeant Taylor told defendant he was giving him a warning only and not issuing a citation. Sergeant Taylor printed out a warning slip along with a

consent form. He returned defendant's identification documents to him and gave him the warning slip and the consent form, written in both English and Spanish. He asked defendant to read the consent form and sign it "if you agree." It took defendant a little over two minutes to read the form and sign it, without any further prompting or comments by Sergeant Taylor. The radio dispatcher then responded with information that the search on Ricardo M. Aguilera, the registered owner of the car, had come back as "inconclusive." Nothing that occurred during the five to six minutes that elapsed after the dispatcher's initial response transformed the detention into an unlawful one.

Because we conclude defendant's detention was lawful and not unduly prolonged, we reject defendant's contention his consent was invalid as the product of an unlawful detention. The record demonstrates defendant's consent to search was voluntary and freely given during the course of a lawful traffic stop and "not the result of duress or coercion, express or implied." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 248.)

## 2. The Admission of Defendant's Statements to the Undercover Detective

Defendant argues the court erred in admitting the incriminating statements he made to the undercover detective because he had invoked his Fifth Amendment right to counsel during his earlier interrogation by Detectives Ruiz and Gray. He says the court erred in overruling his objection and allowing the undercover detective to testify.

It is undisputed that after defendant asserted his right to counsel during the interrogation by Detectives Ruiz and Gray, the interrogation ended, defendant was placed in a holding cell, and defendant made numerous incriminating statements to the undercover detective. In reviewing the propriety of the trial court's

13

order overruling defendant's objection and allowing the statements to be admitted, we independently determine whether the statements were illegally obtained based on those undisputed facts. (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.)

We conclude the trial court correctly overruled defendant's objection.

In *Illinois v. Perkins* (1990) 496 U.S. 292, 300 (*Perkins*), the Supreme Court held that an "undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." *Perkins* came to this conclusion because "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Id*. at p. 296.)

*Perkins* made clear that "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Perkins*, *supra*, 496 U.S. at p. 297.)

Defendant acknowledges *Perkins* but says it did not address the issue of whether undercover agents may be used to elicit statements from a suspect *after* the suspect has invoked his *Miranda* rights. Defendant also acknowledges that California courts have relied on *Perkins* to assess the validity of statements made to an undercover agent even after a defendant has asserted *Miranda* rights during a prior custodial interrogation. (See, e.g., *People v. Orozco* (2019) 32 Cal.App.5th 802, 815 (*Orozco*) [rejecting

14

the argument that a defendant's invocation of right to counsel under *Miranda* precluded the admission of a subsequent confession made to an undercover agent].)

Nonetheless, defendant says *Perkins* is not controlling, relying on Justice Brennan's concurrence in *Perkins* and in particular, a footnote in which Justice Brennan said that while he agreed with the majority, if Mr. Perkins had previously invoked his right to counsel or his right to remain silent under *Miranda*, the relevant inquiry would be whether he knowingly waived that right, citing *Edwards v. Arizona* (1981) 451 U.S. 477, 484–485 (*Edwards*) (holding in part that once an accused invokes right to counsel under *Miranda*, he "is not subject to further interrogation" until counsel is made available or the accused initiates further communication).

*Orozco* rejected the same argument, aptly noting that "*Perkins* had a seven-justice majority . . . so Brennan's concurrence was not the critical fifth vote; as a consequence, the concurrence is dicta." (*Orozco, supra*, 32 Cal.App.5th at p. 815.)  Moreover, the United States Supreme Court has never adopted Brennan's position.  But, the court has said that while " '[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly' " *it should only be enforced in " 'those types of situations in which the concerns that powered the decision are implicated.' "* (*Howes v. Fields* (2012) 565 U.S. 499, 514, italics added.)  This is so because " '[v]oluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law.' "  (*Ibid.*)

We conclude that *Perkins* applies here.  When defendant invoked his right to counsel during the interrogation by Detectives Ruiz and Gray, the interrogation ended.  During his conversation with the undercover detective that followed, defendant was not

15

subjected to coercive interrogation of the type of which *Miranda* was concerned. The incriminating statements he freely made to someone he believed to be a fellow inmate were properly admitted.

Defendant contends that Detectives Ruiz and Gray violated his prior invocation of *Miranda* when they removed him from the cell to tell him they had received evidence pointing to his involvement in the murder of Mr. Mota and then returned him to the cell. We do not agree.

*Orozco* is instructive. There, the defendant was in police custody following the death of his infant daughter and he invoked his right to counsel during questioning. (*Orozco, supra,* 32 Cal.App.5th at pp. 807–808.) The officers thereafter arranged for the defendant's girlfriend to speak with him in an interview room. The conversation was recorded, and the defendant was not aware his girlfriend was acting as an agent of the police. (*Id.* at pp. 808–809, 816.) The officers interrupted the meeting and told them the autopsy findings showed their daughter had been beaten and asked them if they had anything they wanted to say. The defendant said nothing. (*Id.* at pp. 808–809.) The defendant argued that even if the undercover operation had been proper at the beginning, it became a custodial interrogation when the officers interrupted and sought to provoke a response. (*Id.* at p. 816.)

*Orozco* rejected the argument, explaining that defendant said nothing in response to the officers' comments and simply waited for them to leave. (*Orozco, supra,* 32 Cal.App.5th at p. 816.) The defendant then "resumed his one-on-one conversation with [his girlfriend], completely unaware she was an agent of the police. His subsequent confession to her was accordingly not the product of an interrogation." (*Ibid.*)

Similarly here, defendant was not subjected to additional interrogation when Detectives Ruiz and Gray told him they had

16

additional evidence.  He made no incriminating statements to Detectives Ruiz and Gray.  Rather, like the defendant in *Orozco*, he waited for them to leave and then resumed his voluntary conversation with the undercover detective, believing him to be a fellow inmate.  His subsequent incriminating statements were not the result of coercive interrogation and were properly admitted.

The dissent cites *Edwards*, *supra*, 451 U.S. at page 484 in support of the statement that "as long as the second interrogation is initiated by the police, even under the guise of a *Perkins* agent, such an interrogation cannot occur without a valid waiver."  (Dis. opn., *post*, at p. 2.)  *Edwards* does not support that proposition, as there was no *Perkins* agent involved in *Edwards*.  The Supreme Court's opinion in *Perkins*, nine years after *Edwards*, expressly rejected that proposition.  We repeat that, in *Edwards,* the Supreme Court held that an "undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." (*Perkins*, *supra*, 496 U.S. at p. 300.)

The dissent fails to address the primary concern of *Miranda* and its progeny:  coercion.  (*Ariz. v. Mauro* (1987) 481 U.S. 520, 529–530 ["In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*:  preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment."].)  Defendant was not subjected to coercive interrogation with the undercover detective.  By focusing on the fact defendant had previously invoked without assessing whether he was subjected to coercive interrogation, the dissent seeks to change the law, not follow or extend the law with analysis to support the proposed change.  But, "to construe *Miranda* to reach the noncoercive police conduct in this

17

case is to untether *Miranda* from its purpose and, in so doing, undermine its legitimacy as one of the many bulwarks protecting the constitutional rights of criminal defendants." (*Orozco*, *supra*, 32 Cal.App.5th at p. 817.)

Finally, defendant argues we should apply a due process analysis to the court's decision to admit his statements. We decline to do so. Defendant's objection in the trial court was based only on a violation of the Fifth Amendment arising from his assertion of the right to counsel during the interview with Detectives Ruiz and Gray. Defendant did not object in the trial court on the grounds that the use of the undercover operation to obtain a statement from him was a violation of his due process rights. Constitutional claims may not be raised for the first time on appeal unless the new claim does not " 'invoke facts or legal standards different from those the trial court itself was asked to apply.' " (*Tully*, *supra*, 54 Cal.4th at p. 979.) A defendant " 'cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*Id*. at p. 980.) The trial court was not asked to conduct a due process analysis. The contention has been forfeited.

## 3.     The Custody Credits

The People concede that defendant is entitled to an additional day of presentence custody credits. We agree.

## DISPOSITION

The case is remanded with directions to the superior court to award 1,548 actual days of presentence custody credits and to prepare an amended abstract of judgment and forward it to the

18

Department of Corrections and Rehabilitation.  The judgment of conviction is affirmed in all other respects.[1]


GRIMES, J.

I CONCUR:


WILEY, J.

---

[1]     After briefing was completed, defendant wrote a letter asking this court to order the trial court to transmit the exhibits to this court for review.  Defendant offered no explanation for the request.  As is clear from this opinion, defendant did not contend there was not substantial evidence to support the judgment.  We obtained the exhibits but see nothing out of order.  Defendant's request was improper and a misuse of court resources.  Defendant did not file a *Wende* brief, pursuant to *People v. Wende* (1979) 25 Cal.3d 436, and we have no duty to independently search for error in the admission of exhibits in this case.

**Stratton, P.J., Dissenting in part.**

Appellant invoked his right to counsel. The police then immediately stopped their overt questioning of him and put him in a cell with a *Perkins* agent who proceeded to covertly get the information and confession the police wanted to elicit. (*Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).) I do not agree with the majority that it was permissible for a *Perkins* agent to interrogate appellant after he invoked his right to counsel without getting an express waiver of that right. In my view, this issue is not governed by *Perkins* nor does it implicate the principles underlying *Miranda;* it is governed by *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*).

*Edwards* could not have put it more succinctly: "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiated further communication, exchanges, or conversations with the police. (*Edwards, supra*, 451 U.S. at pp. 484–485, fn. omitted.) "It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the

1

accused.' " (*Id.* at p. 482; see also *People v. Storm* (2002) 28 Cal.4th 1007, 1023.)

*Perkins* proceeded on the premise that conversations in a jail between an undercover agent and an accused are, indeed, "custodial interrogations." (*Perkins*, *supra*, 496 U.S. at pp. 297, 299 [the suspect was the "subject of the interrogation"].) Statements made during these types of interrogations, however, are not, in and of themselves, coerced. That is so because they occur when the accused is unaware that they are speaking with law enforcement. Because they are not considered the product of coercion, statements made to *Perkins* agents are generally considered voluntary under *Miranda v. Arizona* (1966) 384 U.S. 436, 462. But, importantly, *Edwards* applies even if the subsequent interrogation after invocation of the right to counsel is not coercive. Under *Edwards,* no police-initiated interrogation whatsoever is to occur unless the accused has given a valid waiver of the right to counsel they previously invoked. (*Edwards*, *supra*, 451 U.S. at p. 484.) The subsequent interrogation might occur, for example, without coercion, at home, in jail, on the street, in a coffee house. But as long as the second interrogation is initiated by the police, even under the guise of a *Perkins* agent, such an interrogation cannot occur without a valid waiver. *Edwards* is not about coercion; it is about securing a valid and knowing waiver of an invoked right. (*Ibid.*) I would find that *Edwards* governs the analysis here.

Using a *Perkins* agent here was a law enforcement procedure calculated to deceive appellant, so that he would not know to whom he was incriminating himself. He was not given an opportunity to knowingly and intelligently waive his previously asserted right to have counsel present during

questioning.  Admission of the statements without a valid waiver was error under *Edwards*.  (*Edwards*, *supra*, 451 U.S. at p. 483.)

I would further find that admission of the statements appellant gave to the *Perkins* agent in contravention of his asserted right to counsel was not harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18.)  They were full-on compelling confessions that guaranteed his conviction.  I would remand to the trial court with directions to vacate the denial of the motion to suppress, vacate the convictions, suppress the statements appellant made to the *Perkins* agent after invocation of his right to counsel, and set a new trial date.

STRATTON, P. J.

3